[L.A. No. 30094. In Bank. Sept. 7, 1973.]

ELIZABETH K. PETTIT, Plaintiff and Appellant, v.
STATE BOARD OF EDUCATION, Defendant and Respondent.

## COUNSEL

Stanley Fleishman and David M. Brown for Plaintiff and Appellant.

Peter T. Galiano, Richard Anthony, A. L. Wirin, Fred Okrand, Laurence R. Sperber and John D. O'Loughlin as Amici Curiae on behalf of Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, Edward M. Belasco and Melvin R. Segal, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**BURKE, J.**—In this case we are asked to review a judgment denying plaintiff mandate to vacate an order of the State Board of Education revoking her elementary school life diploma on the ground that she engaged in certain acts of sexual misconduct evidencing her unfitness to teach. We have concluded that the conduct complained of furnished ample ground to support the order of revocation.

Plaintiff is an elementary school teacher, having held a California teaching credential since 1957. According to the record, in November 1967 plaintiff (then 48 years old) and her husband applied for membership in "The Swingers," a private club in Los Angeles evidently devoted primarily to promoting diverse sexual activities between members at club parties. Sergeant Berk, an undercover officer working for the Los Angeles Police Department, investigated the club, was accepted for membership, and, on December 2, 1967, attended a party at a private residence during which he observed the incidents in question. According to Berk, he entered the residence where the party was held and immediately observed a man and woman (not plaintiff) engaging in sexual intercourse in an open bedroom.

Throughout the evening Sergeant Berk saw various other couples similarly engaged. Berk estimated that there were 20 persons at the party, some of whom were "walking around the residence observing people engaged in these [sexual] acts." In a one-hour period, Berk observed plaintiff commit three separate acts of oral copulation with three different men at the party. When these acts took place, the participants were undressed, and there were other persons looking on.

Plaintiff was subsequently arrested and charged with violating Penal Code section 288a (oral copulation). Evidently a plea bargain was arranged and plaintiff pleaded guilty to Penal Code section 650½ (outraging public decency), a misdemeanor. Plaintiff was fined and placed on probation; upon payment of the fine probation was terminated and the criminal proceedings dismissed.

Subsequently, in February 1970, the disciplinary proceedings now before us were initiated to revoke plaintiff's teaching credential on the grounds (among others) that her conduct involved moral turpitude and demonstrated her unfitness to teach. At the board hearing, Sergeant Berk testified as summarized above. In addition, three elementary school superintendents testified that in their opinion plaintiff's conduct disclosed her unfitness to teach.[1] Plaintiff did not testify at the hearing. However her husband testified, among other things, that plaintiff realized in advance that sexual activities would occur at the Swingers Club party, and that with her consent he had observed plaintiff engage in sexual intercourse and oral copulation with other men in the past. Mr. Pettit also testified that he and plaintiff had, in 1966, appeared on the Joe Pyne television show and also another similar show a few weeks later, and had on both occasions discussed "nonconventional sexual life styles." Mr. Pettit recalled that the subjects of adultery and "wife swapping" were discussed and that "probably" the Pettits expressed a "philosophic" attitude on those subjects since they were not "uptight" about them. Although plaintiff and her husband wore a mask

---

[1]William B. Calton, superintendent of the Cypress School District which employed plaintiff, testified that a person who committed the sexual acts performed by plaintiff would be unfit to teach in an elementary school. In Calton's opinion, a teacher has the responsibility to practice as well as teach moral values; one who failed to practice morality would have difficulty teaching it. Since pupils look to their teacher for moral guidance, plaintiff would lose her effectiveness and ability as a teacher and might even inject her ideas regarding sexual morals into the classroom.

Sylvester A. Moffett, superintendent of the Huntington Beach City Schools, testified that in his opinion plaintiff was unfit to teach, that every teacher should possess high morals, and that it would be difficult to teach morality without practicing it.

Archie J. Haskins, assistant superintendent of the Magnolia School District, testified that one who engaged in the sexual conduct performed by plaintiff would be unfit to instruct elementary school children. According to Haskins, a teacher must set a good moral example for her pupils, for she spends much time with them and has a strong influence over them.

and false beard respectively on these shows, Superintendent Calton testified that one of plaintiff's fellow teachers had discussed plaintiff's televised statements with him and with other teachers.

Dr. William Hartman testified on plaintiff's behalf. Dr. Hartman is a licensed clinical psychologist, a professor of sociology, and a director of a center for marital and sexual studies. He had also known plaintiff socially for several years prior to the hearing. According to Hartman, plaintiff was well-adjusted, and in view of the trauma and emotional turmoil caused by her suspension, was not likely to repeat the prior offenses. Hartman disputed the testimony of the board's witnesses that the nature of the sexual misconduct involved herein would render plaintiff unfit to teach.

Plaintiff introduced an evaluation by her school principal finding her teaching to be satisfactory and commenting upon her classes' progress and improvement. Plaintiff also introduced a contract of employment with her school district offering to rehire her for the 1968-1969 school year. The record is unclear, however, as to when her employer first learned of her Swingers Club activities.

At the conclusion of the hearing, the hearing examiner found that plaintiff has engaged in acts of sexual intercourse and oral copulation with men other than her husband; that plaintiff appeared on television programs while facially disguised and discussed nonconventional sexual behavior, including wife swapping; that although plaintiff's services as a teacher have been "satisfactory," and although she is unlikely to repeat the sexual misconduct, nevertheless she has engaged in immoral and unprofessional conduct, in acts involving moral turpitude, and in acts evidencing her unfitness for service. Accordingly, the hearing examiner concluded that cause exists for the revocation of her life diploma. The board adopted the findings and conclusions of its hearing officer in toto.

Thereafter, plaintiff sought a writ of mandate from the superior court to review and set aside the board's order. (Code Civ. Proc., § 1094.5.) The court, exercising its independent judgment of the evidence,[2] likewise concluded that proper cause existed to revoke plaintiff's teaching credentials and denied mandate.[3] Plaintiff appeals.

[2]See *Morrison* v. *State Board of Education*, 1 Cal.3d 214, 240, and footnote 51 [82 Cal.Rptr. 175, 461 P.2d 375].

[3]The trial court noted that the acts "undeniably committed" by plaintiff were criminal in nature, and were committed in a place where 16 to 20 persons were present. The court also referred to plaintiff's television appearance and the fact that teachers and others on the school staff had learned of them. The court believed that although the opinions of the three school superintendents may not be entitled to great weight, nevertheless they are some evidence of plaintiff's unfitness. In concluding, the court explained the primary basis for its ruling as follows: "The intimate and delicate rela-

The Education Code contains the provisions governing revocation of a teacher's life diploma or credential. Section 13202 provides in pertinent part that the board "shall revoke or suspend for immoral or unprofessional conduct . . . or for any cause which would have warranted the denial of an application for a certification document or the renewal thereof, or for evident unfitness for service, . . ." Among the various statutory grounds for denial of an application for a credential or life diploma, or renewal thereof, are the commission of an act involving moral turpitude and the failure to furnish reasonable evidence of good moral character. (Former § 13129, subds. (e) and (h), now § 13174, subds. (e) and (h).) Finally, *conviction* of various penal offenses, including Penal Code section 288a, is likewise ground for revocation of a life diploma or credential. (§ 13206; see also § 13207 [conviction of sex offenses]; § 12912 [definition of sex offenses]; *DiGenova* v. *State Board of Education*, 45 Cal.2d 255 [288 P.2d 862].)

As stated above, plaintiff was not convicted of the offense of oral copulation but of the misdemeanor offense of outraging public decency, an offense not specified in the foregoing sections as sufficient per se to justify revocation. Therefore, revocation of plaintiff's life diploma cannot be upheld solely by reason of the conviction entered against her.[4] On the other hand,

---

tionships between teachers and students require that teachers be held to standards of morality in their private lives that may not be required of others. Parents have the right to demand high standards of conduct in the personal lives of the teachers of their children, and should have the right to expect that the teachers' concepts of morals and sexual relationships not be at substantial variance with concepts that are generally accepted and approved in the community, and that they not engage in conduct which is proscribed by the criminal laws of this state. It should not be necessary for such unacceptable conduct to manifest itself in the classroom before the Board may, in the best interests of the educational system and of the students, revoke the teaching credentials of one who has evidenced such a disregard of the accepted standards of moral conduct and of the criminal statutes."

[4]Plaintiff and amici suggest that plaintiff's conviction under Penal Code section 650½ is invalid, because of the vagueness of that statute and its reference to "public decency" (see *In re Davis*, 242 Cal.App.2d 645 [51 Cal.Rptr. 702]), the assertedly "private" nature of the offenses in the instant case, or the "ruse" committed by Sergeant Berk in obtaining admission to the club. However, neither the board nor the trial court relied upon plaintiff's conviction itself as grounds for revocation, but upon her underlying *conduct* apart from the conviction.

Amici also call into question the validity of Penal Code section 288a, asserting that oral copulation is an activity protected by the constitutional rights of association and privacy. (But see *People* v. *Drolet*, 30 Cal.App.3d 207 [105 Cal.Rptr. 824]; *People* v. *Hurd*, 5 Cal.App.3d 865 [85 Cal.Rptr. 718]; *People* v. *Roberts*, 256 Cal.App.2d 488 [64 Cal.Rptr. 70].) Without deciding whether section 288a is valid in all of its various applications, we point out that plaintiff is not here seeking any relief from criminal prosecution for her sexual conduct, and accordingly the validity of section 288a is not before us. Instead, the sole question presented herein is whether the record contains sufficient evidence to sustain the trial court's determination that plaintiff's conduct rendered her unfit to teach.

plaintiff has never denied that the acts of oral copulation took place. Accordingly, we must determine whether the trial court properly concluded that plaintiff's conduct constituted "immoral or unprofessional conduct," "evident unfitness to teach," "acts involving moral turpitude," or acts evidencing a lack of "good moral character" within the meaning of the code sections set forth above.

In *Morrison* v. *State Board of Education, supra,* 1 Cal.3d 214, this court was faced with the problem whether certain homosexual conduct by a public school teacher justified revocation under the above statutory language. A majority of the court concluded that, in order to save the statute from attack on vagueness grounds, a teacher's actions could not constitute "immoral or unprofessional conduct" or "moral turpitude" unless that conduct indicated an unfitness to teach. In view of the total lack of evidence in the record demonstrating Morrison's unfitness to teach, the court reversed the superior court's judgment denying mandate. We made it clear, however, that in future cases revocation will be upheld if the evidence discloses that the teacher's retention within the school system "poses a significant danger of harm to either students, school employees, or others who might be affected by his actions as a teacher." (P. 235.) The court suggested that a showing of significant "harm" could be based upon adverse inferences drawn from the teacher's past conduct as to his probable future teaching ability, as well as upon the likelihood that the publicity surrounding the past conduct "may in and of itself substantially impair his function as a teacher." (*Id.*, see *Comings* v. *State Bd. of Education,* 23 Cal.App.3d 94, 104 [100 Cal.Rptr. 73, 47 A.L.R.3d 742]; *Board of Trustees* v. *Stubblefield,* 16 Cal.App.3d 820, 826-827 [94 Cal.Rptr. 318].)

Plaintiff contends that *Morrison* controls here and that the record contains no substantial evidence of her unfitness to teach. We disagree. Initially, we note several important factors which would distinguish *Morrison* from the instant case. In *Morrison,* the unspecified conduct at issue was non-criminal in nature, and the court was careful to point out that oral copulation was not involved. (1 Cal.3d at p. 218, fn. 4.) We further explained that under the Education Code a distinction was made between certain sex crimes (such as oral copulation) which require automatic revocation, and lesser sex offenses which result in "discipline only if it is 'immoral,' 'unprofessional' or involves 'moral turpitude.' " (*Id.* see *Purifoy* v. *State Board of Education,* 30 Cal.App.3d 187, 197 [106 Cal.Rptr. 201].)

A second distinguishing feature between *Morrison* and the instant case is, of course, that in *Morrison* the conduct at issue occurred entirely *in private* and involved only two persons, whereas plaintiff's indiscretions involved three different "partners," were witnessed by several strangers, and

took place in the semi-public atmosphere of a club party.[5] Plaintiff's performance certainly reflected a total lack of concern for privacy, decorum or preservation of her dignity and reputation. Even without expert testimony, the board was entitled to conclude that plaintiff's flagrant display indicated a serious defect of moral character, normal prudence and good common sense. A further indication that plaintiff lacked that minimum degree of discretion and regard for propriety expected of a public school teacher is disclosed by her television appearances, giving notoriety to her unorthodox views regarding sexual morals. As noted above, apparently plaintiff's disguise was not wholly effective for she was recognized by at least one teacher at plaintiff's school.

Finally, in *Morrison* the board acted without sufficient evidence of unfitness to teach. In the instant case, in addition to the evidence of plaintiff's misconduct itself and its criminal and semi-public nature, the board heard expert testimony asserting plaintiff's unfitness to teach. Unlike *Morrison,* wherein we noted that "The board produced no testimony from school officials or others to indicate whether a man such as petitioner might publicly advocate improper conduct" (1 Cal.3d at p. 236), in the instant case three school administrators gave their opinion that plaintiff is unfit to teach (see fn. 1, *ante*). In general, these witnesses expressed concern that plaintiff might attempt to inject her views regarding sexual morality into the classroom or into her private discussions with her pupils, and that plaintiff would be unable effectively to act as a moral example for the children she taught. Plaintiff attacks this testimony as reflecting only the personal opinions of the witnesses regarding unorthodox sexual mores,[6] yet the testimony goes further and calls into question plaintiff's fitness to teach moral principles. Expert testimony is necessarily based to an extent upon the personal opinion of the witness, supported by his special education and experience. We see no reason for discrediting the opinion of a school superintendent regarding the fitness of teachers to teach merely because that opinion is based in part upon personal moral views. Many courts have recognized that testimony by other teachers or school administrators may furnish the necessary evidence of unfitness to teach required by *Morrison.* (See *Board of Trustees* v. *Metzger,* 8 Cal.3d 206, 210 [104 Cal.Rptr. 452, 501 P.2d 1172]; *Governing Board* v. *Brennan,* 18 Cal.App.3d 396, 402 [95 Cal.

[5]Various cases have emphasized the significance of the public nature of a teacher's misconduct, or the notoriety and publicity accorded it. (See *Moser* v. *State Bd. of Education,* 22 Cal.App.3d 988, 990-991 [101 Cal.Rptr. 86]; *Watson* v. *State Bd. of Education,* 22 Cal.App.3d 559, 564 [99 Cal.Rptr. 468]; *Comings* v. *State Bd. of Education, supra,* 23 Cal.App.3d 94, 105-106; *Board of Trustees* v. *Stubblefield, supra,* 16 Cal.App.3d 820, 826.)

[6]As noted above (fn. 3), the trial court found that, the superintendents' testimony, although not entitled to "great weight," did constitute some evidence of unfitness to teach.

Rptr. 712]; *Comings* v. *State Bd. of Education, supra,* 23 Cal.App.3d 94, 105-106.)

As noted above, the board's witnesses testified that in their opinion it was likely that plaintiff would be unable to set a proper example for her pupils or to teach moral principles to them. Yet it is the statutory duty of a teacher to "endeavor to impress upon the minds of the pupils the principles of morality . . . and to instruct them in manners and morals . . . ." (Ed. Code, § 13556.5.) Accordingly, several cases have held that the inability of a teacher to obey the laws of this state or otherwise act in accordance with traditional moral principles may constitute sufficient ground for revocation or dismissal. (See *Watson* v. *State Bd. of Education, supra,* 22 Cal.App.3d 559, 564-565 [alcoholic teacher with record of drunken driving]; *Governing Board* v. *Brennan, supra,* 18 Cal.App.3d 396, 402 [teacher advocated illegal marijuana use]; *Board of Trustees* v. *Stubblefield, supra,* 16 Cal. App.3d 820, 824-826 [teacher was found in compromising position with student, assaulted police officer and resisted arrest]; *Sarac* v. *State Bd. of Education,* 249 Cal.App.2d 58, 63-64 [57 Cal.Rptr. 69] [disapproved on other grounds in *Morrison* v. *State Board of Education, supra,* 1 Cal.3d 214, 238; teacher made homosexual advance toward police officer at public beach]; *Vogulkin* v. *State Board of Education,* 194 Cal.App.2d 424, 429-430 [15 Cal.Rptr. 335] [teacher convicted of unspecified sex offense].)

As this court stated in *Board of Education* v. *Swan,* 41 Cal.2d 546, 552 [261 P.2d 261], "A teacher . . . in the public school system is regarded by the public and pupils in the light of an exemplar, whose words and actions are likely to be followed by the children coming under her care and protection." ■ In the instant case, the board and the trial court were entitled to conclude, on the basis of the expert testimony set forth above and the very nature of the misconduct involved, that Mrs. Pettit's illicit and indiscreet actions disclosed her unfitness to teach in public elementary schools.[7]

The judgment is affirmed.

Wright, C. J., McComb, J., Sullivan, J., and Clark, J., concurred.

---

[7]Plaintiff points to the finding of the board that she is unlikely to repeat the misconduct which led to her suspension. Yet the "risk of harm" which justified revocation of plaintiff's license in this case is not the likelihood that plaintiff will perform additional sexual offenses but instead that she will be unable to teach moral principles, to act as an exemplar for her pupils, or to offer them suitable moral guidance.

**TOBRINER, J.**—For the past 13 years plaintiff has taught mentally re-tarded elementary school children, a task requiring exceptional skill and patience. Throughout her career her competence has been unquestioned; not a scintilla of evidence suggests that she has ever failed properly to perform her professional responsibilities. One can ask for no better proof of fitness to teach than this record of consistent, capable performance.

Yet in the face of this record, the State Board of Education, branding plaintiff "unfit," revokes her elementary school life diploma—a ruling that will not only force her discharge from her present employment, but, regard-less of the need for a teacher of her experience and qualifications, will also bar any school district in California from hiring her. Looking only to the loss of future earnings, we must recognize that the board inflicts a penalty of well over $100,000; the ruling, moreover, entails immeasurably greater psychological damage. Equally immeasurable is the loss to school districts that are denied the right to employ a skilled and dedicated teacher.

One would expect that before inflicting such injury, the board would insist upon solid and credible evidence that clearly established plaintiff's lack of fitness to teach. Instead, as I shall show, the board has acted on the basis of questionable conjecture.[1]

Our analysis of the issues in this case must begin with *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375], an opinion of this court that defines the showing required for a rev-ocation of teaching credentials. That decision recognized the general prop-osition that no person may be barred from a profession upon grounds unrelated to his fitness to perform his professional obligations. (See *Board of Trustees* v. *Metzger* (1972) 8 Cal.3d 206, 210 [104 Cal.Rptr. 452, 501 P.2d 1172]; *Nightingale* v. *State Personnel Board* (1972) 7 Cal.3d 507, 512 [102.Cal.Rptr. 758, 498 P.2d 1006]; *Monroe* v. *Trustees of the Cali-fornia State Colleges* (1971) 6 Cal.3d 399, 412 [99 Cal.Rptr. 129, 491 P.2d 1105]; *Perrine* v. *Municipal Court* (1971) 5 Cal.3d 656, 663 [97 Cal.Rptr. 320, 488 P.2d 648].)

Morrison had engaged in a single incident of homosexual activity in-volving another teacher. Concluding that this activity constituted "immoral conduct," "unprofessional conduct," and "acts involving moral turpitude" under Education Code section 13202, the State Board of Education revoked

---

[1]In proceedings for the disbarment of attorneys or for the revocation of real estate licenses, the courts have held that "guilt must be established to a reasonable cer-tainty . . . and cannot be based on surmise or conjecture, suspicion or theoretical conclusions, or uncorroborated hearsay." (*Small* v. *Smith* (1971) 16 Cal.App.3d 450, 457 [94 Cal.Rptr. 136].) The same degree of proof should be required for the revocation of a teaching certificate.

his life diploma. On appeal, Morrison contended that the vagueness of the standards for revocation set out in section 13202 would permit the board to discipline a teacher merely because his private, personal conduct affronted the moral views of the board members.

To avoid finding section 13202 unconstitutional, we adopted a limited construction of that statute, holding that its "terms denote immoral or unprofessional conduct or moral turpitude of the teacher which indicates unfitness to teach." (1 Cal.3d at p. 225.) Specifically, we held that "an individual can be removed from the teaching profession only upon a showing that his retention in the profession poses a significant danger of harm to either students, school employees, or others who might be affected by his action as a teacher." (1 Cal.3d at p. 235.)

We then turned to the question whether proof of Morrison's homosexual conduct in itself constituted evidence of unfitness to teach. We stated: "Before the board can conclude that a teacher's continued retention in the profession presents a significant danger of harm to students or fellow teachers, essential factual premises in its reasoning should be supported by evidence or official notice. In this case, despite the quantity and quality of information available about human sexual behavior, the record contains no such evidence as to the significance and implications of the . . . incident. Neither this court nor the superior court is authorized to rectify this failure by uninformed speculation or conjecture as to petitioner's future conduct." (1 Cal.3d at p. 237.) Concluding that no competent, credible evidence supported any inference of Morrison's unfitness to teach, we reversed the judgment of the superior court.

The majority opinion maintains that in the present case, unlike *Morrison,* substantial evidence supports the superior court's finding of unfitness to teach. They base this conclusion on three asserted differences between *Morrison* and the present case: that plaintiff's conduct was criminal in nature; that the acts occurred in a "semi-public atmosphere," and that the board presented expert opinion that she was unfit to teach. None of these distinctions will stand analysis.

Although the majority's whole case rests upon the proposition that one who engages in oral copulation commits a criminal act that constitutes "immoral or unprofessional conduct," the record does not show any such conviction for such offense by plaintiff. The majority likewise frankly concede that the "revocation of plaintiff's life diploma cannot be upheld solely by reason of the conviction [of outraging public decency] entered against her."

(Majority opn., *ante,* p. 33.)[2] The record of that conviction, moreover, has been cleared from the books; it is no longer extant; those criminal proceedings have been dismissed. (See Pen. Code, § 1203.4.)

The board in the instant case has been driven to exhume an old and admitted indiscretion in order to lay the basis for the revocation of plaintiff's teaching credential. The challenged act was committed on December 2, 1967; the criminal proceedings were thereafter dismissed; subsequently, in February 1970—years later—the disciplinary proceedings were initiated. I am hard-put to understand the motivation of the board in bringing charges on a matter which plaintiff now recognizes as an indiscretion and for which she has paid the penalty—charges brought despite the fact that plaintiff has devoted 13 years to the exemplary and humane teaching of retarded elementary school children—charges designed to bar her permanently from teaching.

The kind of wastefulness of needed human resources that this procedure threatens becomes the more dangerous when we examine it in the context of other professions. If a highly proficient attorney commits an unorthodox sex act and thereafter suffers a misdemeanor conviction that is subsequently dismissed, may he then, years later, be disbarred because he admittedly committed the act and hence was guilty of "immoral" and "unprofessional" conduct? Should the skilled surgeon involved in a parallel situation suffer the same tragedy? The university professor? The danger of the majority's doctrine becomes especially onerous when we know that a large proportion of the younger generation do engage in unorthodox sexual activities deemed anathema by some members of the older generation. To what extent will we frustrate highly productive careers of younger persons in order to castigate conduct that is widely practiced by some but regarded by others as abominable? Is the legal standard to be no more definite or precise than that the involved practice is regarded as "immoral" or "unprofessional" or "tasteless" by judges?

The majority opinion does, indeed, proceed on the premise that plaintiff's failure to deny the act of oral copulation suffices to make her a confessed criminal and hence subject to cancellation of her certificate. On this ground the majority would distinguish *Morrison* because there the teacher's conduct infringed no penal statute. Yet in *Morrison* we expressly stated that "[i]n determining whether discipline is authorized and reasonable, a criminal conviction has no talismanic significance." (1 Cal.3d at p. 219, fn. 4.) This

---

[2]I note that Penal Code section 650½, which declares the misdemeanor of outraging public decency, was held unconstitutional in *In re Davis* (1966) 242 Cal. App.2d 645 [51 Cal.Rptr. 702]. In any event plaintiff's conduct, which occurred in a private home rather than in "public," and offended no one present, could not fall within the terms of this statute.

principle was recently reaffirmed by the Court of Appeal in *Comings* v. *State Bd. of Education* (1972) 23 Cal.App.3d 94 [100 Cal.Rptr. 73, 47 A.L.R.3d 742], which held that proof that a teacher had been convicted of possession of marijuana was not evidence of his unfitness to teach, and thus insufficient to sustain the revocation of a credential.

The principle that a criminal conviction is not ipso facto the basis for revocation of a certificate on the grounds of immoral or unprofessional conduct becomes clear when tested against specific acts of unlawful conduct. Obviously the commission of a misdemeanor, such as a traffic offense, could not seriously be urged as an automatic ground for revocation of a certificate. Convictions of other technical and legal offenses common in the society do not intrinsically constitute "immoral" or "unprofessional" conduct. Hence, in order to resolve the issue, we must examine the nature of the conduct and its relation, if any, to the role and functions of the teacher.

In the instant case the conduct involved consensual sexual behavior which deviated from traditional norms. Yet recognized authority tells us the practice pursued here is, indeed, quite common. An estimated "95% of adult American men and a large percentage of American women have experienced orgasm in an illegal manner." (McCary, Human Sexuality (2d ed. 1973) p. 460.)[3] The 1953 Kinsey report, Sexual Behavior in the Human Female, at page 399 indicates that 62 percent of the adult women of plaintiff's educational level and age range engage in oral copulation; more recently, the report's co-authors have stated that newer studies suggest the figure now lies around 75 to 80 percent.[4]

The consensual and, as I shall explain, private act did not affect, and could not have affected, plaintiff's teaching ability. The whole matter would have been forgotten and lost in the limbo of the privacy of its occurrence if it had not been clandestinely observed by means of a surreptitious intrusion which reminds one of the surveillance of restrooms which this court has condemned. (*People* v. *Triggs* (1973) 8 Cal.3d 884 [106 Cal.Rptr. 408, 506 P.2d 232].) The commission of a sex act, surreptitiously observed, not disclosed to fellow teachers or to pupils, not remotely adversely affecting plaintiff's teaching ability, must fail to support revocation of the certificate even though the act is labelled "criminal" on the books.

I am at somewhat of a loss to understand the majority's second ground for distinguishing *Morrison*: that plaintiff's acts in the instant case took

---

[3]The Kinsey Reports (Kinsey, Pomeroy & Martin, Sexual Behavior in the Human Male (1948); Kinsey, Pomeroy, Martin & Gebhard, Sexual Behavior in the Human Female (1953)) remain the only large scale studies.

[4]Testimony of Dr. William Hartman, professor of sociology at California State College, Long Beach, before the State Board of Education in the present proceeding.

place in the "semi-public atmosphere of a club party." (Majority opn., *ante,* p. 35.) Recognizing that many sexual acts incur no disapprobation when done in private, yet are properly punishable when forced upon an unwilling and disapproving viewer, statutes and decisions distinguish between private acts and those which occur in a public place or are open to public observation. For this purpose, the defining characteristic of a public place (Pen. Code, § 647) is "annoyance to or the possibility of annoyance to members of the public present on premises where such acts are committed." (*In re Steinke* (1969) 2 Cal.App.3d 569, 576-577 [82 Cal.Rptr. 789].)

Plaintiff's acts occurred in the bedroom of a private home. The only persons witnessing the conduct were members of "The Swingers," a private club limited to persons who expressly attested their desire to view or engage in diverse sexual activity. Consequently, I conclude that plaintiff's acts occurred in a private place, not a public one or one open to public view.

By engaging in sexual activity in the presence of other "swingers," plaintiff, the majority assert, demonstrated "a serious defect of moral character, normal prudence and good common sense." (Majority opn., *ante,* p. 35.)[5] Yet plaintiff took reasonable precautions to assure that she was viewed only by persons who would not be offended by her conduct; many would argue that under such circumstances her behavior was neither imprudent nor immoral. In essence, the majority are saying that even though her fellow "swingers" were not offended, they—the majority—find plaintiff's behavior shocking and embarrassing. Yet this important issue of plaintiff's right to teach should not turn on the personal distaste of judges; the test, as this court has announced in the cases, is the rational one of the effect of the conduct, if any, on the teacher's fitness to teach.

I turn now to an examination of the underlying expert testimony presented to establish plaintiff's unfitness to teach. The first witness, William B. Calton, opined that plaintiff would be unable to teach "moral and spiritual principles." On cross-examination he limited this opinion to asserting that she would be unable to teach principles of sexual morality. But petitioner teaches retarded elementary school children, and, as Calton affirmed, her teaching duties do not encompass instruction on sexual morality. To sum

---

[5]The majority's argument is analogous to that presented by the school board in *Fisher* v. *Snyder* (D.Neb. 1972) 346 F.Supp. 396, in which a teacher who permitted men to stay overnight in her apartment was discharged for "conduct unbecoming a teacher." Finding the discharge a violation of the teacher's constitutional right to freedom of association (see 346 F.Supp. at p. 400), the court stated that the evidence supplied "no proof of impropriety in Mrs. Fisher's conduct which affected her classroom performance, . . ." (346 F.Supp. at p. 398.) The court added that the evidence, at most, raised a question of her good judgment in her personal affairs, but that issue was not sufficient to indicate unfitness to teach.

up Calton's testimony: he states that plaintiff is unable to teach principles of sexual morality but that her teaching duties do not include the teaching of sexual morality.[6]

The second expert, Sylvester A. Moffet, testified with a broader brush. He stated that any teacher who ever engaged in sexual relations with anyone other than his lawful spouse was lacking in "clean morals," and thus could not instruct his students in "clean morals." In *Morrison* we stated that "[s]urely incidents of extramarital heterosexual conduct against a background of years of satisfactory teaching would not constitute 'immoral conduct' sufficient to justify revocation of a life diploma without any showing of an adverse effect on fitness to teach." (1 Cal.3d at pp. 225-226.) Moffet obviously disagrees, and would raise a standard that would furnish grounds for dismissal of innumerable teachers of this state.

The final expert, Archie Haskins, advanced an idiosyncratic definition of a "dishonest marriage"; honesty, to him, is not a matter of truthfulness and open dealing, but of sexual fidelity. Reasoning from this personal premise, he concludes that petitioner's marriage is a dishonest one. On cross-examination Haskins added the interesting note that "possibly sixty or seventy percent of me would feel that she was unfit and thirty percent of me would feel that I would need to give her some latitude personally." Haskins, however, is willing to subordinate his personal doubts to that which he believes would be the desires of his school board; as he testified "I may have private opinions as a school administrator, but I have five people on the Board of Education that I report to, and again, depending on what you know about that board; how they feel . . . I would probably designate her as unfit."

As we said in *People* v. *Bassett* (1968) 69 Cal.2d 122, 141 [70 Cal. Rptr. 193, 443 P.2d 777]: " 'Expert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the *facts* and the validity of the *reasons* advanced for the conclusions.' " (Quoting,

---

[6]The majority opinion cites Education Code section 13556.5, which requires teachers to "endeavor to impress upon the minds of the pupils the principles of morality," and assumes this statute refers to orthodox sexual practices. The State Board of Education, however, has adopted regulations implementing this statute. Those regulations, which are too lengthy to quote here, make no mention of sexual practices, but define morality in terms of truthfulness, respect for the opinion of others, freedom of conscience, respect for personal and group differences, and appreciation of the contributions of religious heritage. This administrative interpretation of the statute "is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized." (*Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1]; *Meyer* v. *Board of Trustees* (1961) 195 Cal.App.2d 420, 431 [15 Cal.Rptr. 717].) No evidence appears to suggest that plaintiff is unable to teach principles of honesty and respect for others.

with added italics, from *People* v. *Martin* (1948) 87 Cal.App.2d 581, 584 [197 P.2d 379].) The only "fact" mentioned by the experts was the incident at the "swingers' " party; this fact was already in the record; we have submitted that in itself, it is not proof of unfitness to teach. The experts present no *reasons* for their conclusions. None of them know plaintiff; none considered her 13-year record of competent teaching; none could point to a single instance of past misconduct with students, nor articulate the nature of any possible future misconduct.

It is not surprising that the trial court concluded that the experts' opinions were not entitled to "great weight." Justice Cobey of the Court of Appeal put it even more accurately, holding that this expert opinion "does not reasonably inspire confidence nor is it of solid value."

The unproven premise of both the expert testimony and the majority opinion is that the fact of plaintiff's sexual acts at the "swingers' " party in itself demonstrates that she would be unable to set a proper example for her pupils or to teach them moral principles; this inability in turn demonstrates her unfitness to teach. This reasoning rests on factual assumptions concerning the relationship of consensual adult sexual behavior to classroom teaching which have absolutely no support in the evidence. If "immoral conduct" ipso facto shows inability to model or teach morals, and this in turn shows unfitness to teach, then we are left with the proposition that proof of "immoral conduct," whatever it may be, will always justify revocation of a teaching credential.

But in traveling this road the majority overlook constitutional predicates. Under the majority's interpretation of Education Code section 13202, the opinion of a superintendent that a teacher has committed an "immoral" act is sufficient to bar that teacher permanently from the profession; so interpreted, section 13202 would be unconstitutionally vague and overbroad. The concept of "immoral" conduct as enunciated by the majority roams without restraint. Undoubtedly some school superintendents believe the drinking of alcohol, the smoking of tobacco, or the playing of cards is immoral; others believe it immoral to serve in the military forces, and still others believe it immoral to refuse to serve. As the present case illustrates, there is a wide divergence of views on sexual morality; plaintiff did not believe her conduct immoral, and many would agree.[7] Since the statute, so interpreted, presents a vortex of vagueness, provides no warning of the kind

---

[7]As Justice Sims observed in his concurring opinion in *Oakland Unified Sch. Dist.* v. *Olicker* (1972) 25 Cal.App.3d 1098, 1112 [102 Cal.Rptr. 421]: "[I]n this world there are many cultures and many concepts of what is acceptable sexual conduct, . . . It may be impossible to impose one strict moral code on all of society, and we may have to acquaint ourselves with, and accept, without puritanical prudery, as natural to them, the standards of others."

of conduct that will lead to discipline, and establishes no standard by which the decision of the board can be measured, it is unconstitutionally vague.[8] These are the reasons why this court in *Morrison* concluded that the only viable test was the fitness of the teacher to teach.

In conclusion, I submit that the majority opinion is blind to the reality of sexual behavior. Its view that teachers in their private lives should exemplify Victorian principles of sexual morality, and in the classroom should subliminally indoctrinate the pupils in such principles, is hopelessly unrealistic and atavistic. The children of California are entitled to competent and dedicated teachers; when, as in this case, such a teacher is forced to abandon her lifetime profession, the children are the losers.

**MOSK, J.**—I dissent for the reasons thoughtfully and persuasively discussed by Justice Tobriner. I am also impressed with the cogent amici curiae argument presented, significantly, by two respected professional organizations: the National Education Association and the California Teachers' Association. And I note that a similar considered conclusion was reached by Justices Cobey and Schweitzer for the Court of Appeal.

In my opinion this court is conclusively bound by two unequivocal factual findings of the State Board of Education: that petitioner's "services as a teacher have been satisfactory and she was invited back to teach by the tender of a contract from her employer for the school year 1968-69" (*subsequent* to the incident involved herein); and that petitioner "is unlikely to repeat" the activities charged in the accusation.

In view of those controlling factual determinations the majority opinion is unsupportable.

---

[8] I note that the United States District Court for the District of Oregon, in a recent decision, held an Oregon statute permitting the dismissal of teachers for "immorality" to be unconstitutionally vague. (*Burton* v. *Cascade School Dist.* (D.Ore. 1973) 353 F.Supp. 254.)