[Crim. No. 5437. Fourth Dist., Div. One. Feb. 20, 1974.]

THE PEOPLE, Plaintiff and Appellant, v.
PHILIP WINSOR BALDWIN et al., Defendants and Respondents.

---

## COUNSEL

Edwin L. Miller, District Attorney, Terry J. Knoepp and Peter J. Long-anbach, Deputy District Attorneys, for Plaintiff and Appellant. ·

Ruffin & Whalen and Roger S. Ruffin for Defendants and Respondents.

A. L. Wirin, Fred Okrand, John D. O'Loughlin and Jill Jakes as Amici Curiae on behalf of Defendants and Respondents.

---

## OPINION

**WHELAN, Acting P. J.**—The People have appealed from the dismissal of an action charging a violation of Penal Code section 288a after the sustaining of a demurrer to the information, without leave to amend, upon the ground that the facts stated do not constitute a public offense.

The act with which defendants were charged occurred in a public restroom at 3:40 a.m. within the view of a San Diego police officer in plain clothes, whose presence in the restroom was known and observable by defendants, one of whom (Dill) a few minutes earlier had taken hold of the policeman's testicles while the latter stood at a urinal in the restroom.

The grounds urged by defendants in the trial court and in this appeal are that section 288a contravenes the nonestablishment clause of the First Amendment to the federal Constitution and section 4 of article I of the California Constitution; that it is further unconstitutional under the federal constitutional right to privacy, and the right to privacy guaranteed by section 1 of article I of the California Constitution; and that the defendants have standing to raise the constitutional issues.

An amicus brief urges the same points, with the additional arguments

that the right to privacy of one's sex life is fundamental, and the right to privacy inheres in the individual.

■ The defendants assert section 288a violates the nonestablishment prohibition of the First Amendment to the federal Constitution. They state correctly that the reasons given or discussed by the trial judge in sustaining the demurrer did not touch upon that subject.

The burden of the argument is that sodomy and oral copulation (fellatio and cunnilingus), defined as crimes in our law, are so defined only because they were regarded as sins in the system of morals of the Judaeo-Christian religions, which uniquely among religions consider them to be morally wrong. The definition of them as crimes, the argument follows, establishes, in that respect, a religious principle as a part of the criminal law, in violation of the constitutional proscription against such establishment.

As evidence that those acts have become crimes within our legal system only because denounced as sinful by the Christian religion, defendants cite Pollock & Maitland's History of English Law, to the effect that until well into the reign of Henry VIII the acts were punishable in the ecclesiastical courts (Pollock & Maitland, *op. cit.*, ch. 7, § 4; and p. 556.)

The learned legal historians wrote also: "Some other crimes which old law had treated with great severity were appropriated by the church and so escaped from lay justice. Almost the whole province of sexual morality had been annexed. . . . [F]ornication, adultery, incest and bigamy were ecclesiastical offences, and the lay courts had nothing to say about them . . . ." (2 Pollock & Maitland, History of English Law, p. 543.) On pages 542-543, the same writers state ". . . perjury was a sin cognizable by the ecclesiastical courts."

Since incest was listed as one of the crimes under the exclusive jurisdiction of the English ecclesiastical court, under defendants' argument our statute making incest a criminal offense would likewise be unconstitutional as violative of the nonestablishment clause of the First Amendment.[1]

---

[1]Not only had the punishment of certain crimes become the exclusive province of the ecclesiastical court, but that court had acquired exclusive jurisdiction to determine whether there was a testamentary gift of personalty. (2 Pollock & Maitland, *op. cit.*, pp. 333-334.)

The doctrine of the enforceability of a gift for the use of another seems also to have been developed within an ecclesiastical framework, and, at least in its earliest stage in the English law, to have been known only to the ecclesiastical courts. (2 Pollock & Maitland, *op. cit.*, pp. 231-232.)

An extension of defendants' argument would permit a legal reformer, zealous to do away with a system that permits testamentary legacies and conveyances in trust, to invoke the First Amendment's nonestablishment provision in support of his program.

The exclusive jurisdiction of the ecclesiastical court to punish a certain offense was sometimes the result of competition with the royal courts over a matter as to which each claimed jurisdiction, and was likely to be the result of a claim that a certain crime known to the civil law, being also a sin, should be punishable in the court which could grade the punishment according to the degree of culpability, rather than the result of a crime's being defined as such because it was first considered a sin.

A prohibition against polygamous marriage likewise has been a tenet of most of the Christian religions. The claim that, because of that fact, a law making polygamous marriages criminal in federal territory violated the nonestablishment provision of the First Amendment was rejected in *Davis* v. *Beason,* 133 U.S. 333 [33 L.Ed. 637, 10 S.Ct. 299].

Any nondormant legislative enactment of long standing reflects a public consensus, however arrived at and from whatever derivation, as to the subject matter of the legislation. It is not uncommon that the original source of the ideas expressed is so remote that subjective awareness of the source is absent and the opinion expressed seems to be endemic in the public consciousness. So it is with legislation that might be thought to have a religious derivation. As stated by the Supreme Court in dealing with a Sunday closing law: "Cultural history establishes not a few practices and prohibitions religious in origin which are retained as secular institutions and ways long after their religious sanctions and justifications are gone." (*McGowan* v. *Maryland,* 366 U.S. 420, 503-504 [6 L.Ed.2d 393, 443, 81 S.Ct. 1101, 1177].)

Penal Code section 288a does not offend against the nonestablishment clause of the First Amendment to the federal Constitution.

Supposing that the condemned practice were an act of religious observance, the statute would still not violate article I, section 4 of the California Constitution, which reads: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be guaranteed in this State; and no person shall be rendered incompetent to be a witness or juror on account of his opinions on matters of religious belief; *but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with peace or safety of this State."* [Italics added.]

The claim defendants have standing to assert the unconstitutionality of the statute on the ground it violates a right of privacy, and a right of marital privacy, has been answered in *People* v. *Parker,* 33 Cal.App.3d 842, 848-850 [109 Cal.Rptr. 354]. The act for which defendants are

prosecuted was not performed in private, nor are they husband and wife, nor, so far as appears, partners in any sort of stable union.

While there are arguments against the constitutionality of the statute based upon considerations of marital privacy, or of the privacy of consenting adults, to an act done in private, we need not reach the constitutional question. (*United States* v. *Raines,* 362 U.S. 17, 21 [4 L.Ed.2d 524, 529, 80 S.Ct. 519, 522]; *In re Cregler,* 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305].)[2]

*Griswold* v. *Connecticut,* 381 U.S. 479, 481 [14 L.Ed.2d 510, 512-513, 85 S.Ct. 1678, 1679-1680], cannot be interpreted as giving standing to persons in the position of defendants to assert the constitutional rights of married couples or of consenting adults acting in privacy. The basis of the holding that the defendants there had standing to attack Connecticut's statute is found in this language: "We think that appellants have standing to raise the constitutional rights of the married people with whom they had a professional relationship. *Tileston* v. *Ullman,* 318 U.S. 44, is different, for there the plaintiff seeking to represent others asked for a declaratory judgment. In that situation we thought that the requirements of standing should be strict, lest the standards of 'case or controversy' in Article III of the Constitution become blurred. Here those doubts are removed by reason of a criminal conviction for serving married couples in violation of an aiding-and-abetting statute. Certainly the accessory should have standing to assert that the offense which he is charged with assisting is not, or cannot constitutionally be a crime."

The Supreme Court in *Younger* v. *Harris,* 401 U.S. 37, 50-52 [27 L.Ed. 2d 669, 679-680, 91 S.Ct. 746, 753-754] stated: "It is undoubtedly true, as the Court stated in *Dombrowski,* that '[a] criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms.' 380 U.S., at 486. But this sort of 'chilling effect,' as the Court called it, should not by itself justify federal intervention. In the first place, the chilling effect cannot be satisfactorily eliminated by federal injunctive

---

[2]In *Cotner* v. *Henry,* 394 F.2d 873, the defendant, as a result of his wife's complaint, had been charged with sodomy committed upon her. He pleaded guilty without having been advised there was a substantial constitutional question whether the statute could be enforced against the partner to a marriage in the privacy of the bedroom, in the absence of force. The record did not show whether force was used. Habeas corpus was held available to set aside the plea for the purpose of a remand. The court observed: "The Indiana courts might, however, construe the statute as being inapplicable to married couples or as outlawing such physical relations between married couples only when accomplished by force." (Pp. 875-876.)

relief. In *Dombrowski* itself the Court stated that the injunction to be issued there could be lifted if the State obtained an 'acceptable limiting construction' from the state courts. The Court then made clear that once this was done, prosecutions could then be brought for conduct occurring before the narrowing construction was made, and proper convictions could stand so long as the defendants were not deprived of fair warning. 380 U.S., at 491 n. 7. The kind of relief granted in *Dombrowski* thus does not effectively eliminate uncertainty as to the coverage of the state statute and leaves most citizens with virtually the same doubts as before regarding the danger that their conduct might eventually be subjected to criminal sanctions. . . .

". . . Just as the incidental 'chilling effect' of such statutes does not automatically render them unconstitutional, so the chilling effect that admittedly can result from the very existence of certain laws on the statute books does not in itself justify prohibiting the State from carrying out the important and necessary task of enforcing these laws against socially harmful conduct that the State believes in good faith to be punishable under its laws and the Constitution."

It is noted that the three-judge district court decision cited by defendants—*Buchanan* v. *Batchelor,* 308 F.Supp. 729—was not only reversed with directions to reconsider it in the light of *Younger* v. *Harris, supra,* 401 U.S. 37, 50-52, but the original party to it who had been made a defendant in a criminal prosecution had dismissed his suit, leaving as plaintiffs a homosexual who engaged in homosexual acts only in private and a husband and wife who had intervened claiming they feared they might some time be arrested while in bed together.

The *Buchanan* v. *Batchelor* court itself said: "In the complaint filed by Buchanan there was serious question as to whether this plaintiff had standing to raise the constitutional rights of married persons committing acts of sodomy, or of homosexuals performing such acts with another male in private. [Citations.]" (308 F.Supp. 729, 731.) That court wrote also, at page 733: "We agree that it is not the function of the Court to determine the policy of the state as it relates to morals. The State has regulated sexual relations by the passage of laws prohibiting what it considers immoral acts, such as adultery and fornication and we believe that it has that right with reference to sodomy. The Court's holding today, 'in no way interferes with a State's proper regulation of sexual promiscuity or misconduct.' [Citation.]

". . . . . . . . . . . . . . . . . . .

"Sodomy is not an act which has the approval of the majority of the people. In fact such conduct is probably offensive to the vast majority."[3]

The factual reasons for the decision in *People* v. *Triggs,* 8 Cal.3d 884 [106 Cal.Rptr. 408, 506 P.2d 232], are absent here. There, the forbidden act was observed being committed in a single toilet stall which had no door. However, the police did not look through the open doorway, but, from outside the restroom, looked through a hole in the wall of the public restroom, where they maintained a surveillance by which they invaded the privacy of offender and nonoffender alike, not having reasonable cause to believe any crime was being committed at the time they chose to make their observation.[4]

Resort to the decision in *Morrison* v. *State Board of Education,* 1 Cal. 3d 214 [82 Cal.Rptr. 175, 461 P.2d 375], as a weapon in the attack upon the constitutionality of Penal Code section 288a has been misplaced. Whatever of a noncriminal nature Morrison may have done in the privacy of his apartment with a man he had befriended came to light only as a result of a disclosure made by the other man.

Oral copulation, carried on in a public place, within the field of vision of a third person who has a right to be there, is immoral and unprofessional conduct within the meaning of the Education Code. (*Pettit* v. *State Board of Education,* 10 Cal.3d 29 [109 Cal.Rptr. 665, 513 P.2d 889].)[5]

---

[3]See also *Wainwright* v. *Stone* (1973) 414 U.S. 21 [38 L.Ed.2d 179, 94 S.Ct. 190], in which the language of a Florida statute, proscribing "abominable and detestable crimes against nature, either with mankind or with beast," was held not constitutionally vague and therefore void at the time defendants were convicted. The basis of the court's conclusion was that the Florida Supreme Court had expressly forbidden the indentifiable conduct in question (see *Delaney* v. *State* (Fla. 1966) 190 So.2d 578) and defendants were on clear notice their conduct was criminal under the statute.

[4]In *Smayda* v. *United States,* 352 F.2d 251, the Circuit Court of Appeals, passing upon a conviction of violation of section 288a in a federal park, made a federal crime by the "Assimilative Crimes" Act, 18 United States Code section 13, decided not to adopt the previously declared California rule that evidence obtained by exterior surveillance of an enclosed toilet stall is violative of a Fourth Amendment right. Perhaps the court in *Smayda* might have distinguished the facts there by pointing out that each of the participants in the forbidden act was seeking to assert a right to the privacy of two toilet stalls in the partition between which someone with like inclinations, it might be assumed, had cut a hole at a convenient height. There might thus have been recognized a right to that modicum of privacy that the (original) design of the stall afforded.

[5]A footnote in *Pettit* states: "Amici also call into question the validity of Penal Code section 288a, asserting that oral copulation is an activity protected by the constitutional rights of association and privacy. [Citations.] Without deciding whether section 288a is valid in all of its various applications, we point out that plaintiff is not here seeking any relief from criminal prosecution . . . ." (Fn. 4, p. 33.)

In *People* v. *Drolet,* 30 Cal.App.3d 207 [105 Cal.Rptr. 824], some of the contentions made by defendants here were dealt with, as well as a claim oral copulation is a form of speech protected by the First Amendment. In *Drolet,* the court said, at pages 211-212: "Neither the equal protection clause nor the right of privacy is involved in this proceeding.

"$\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$

"In the exercise of its police power, each state has the right to enact laws to promote public health, safety, morals and welfare. [Citations.] Penal statutes proscribing illicit sexual contacts constitute a legitimate and proper exercise of that power. (See concurring opinions of Mr. Justice Goldberg and Mr. Justice White *Griswold* v. *Connecticut, supra,* 381 U.S. 479, 498-499, 505 [14 L.Ed.2d 510, 523-524, 527].) The exercise of this power is a legitimate legislative function, and the courts do not sit as a super-legislative body to determine the desirability or propriety of statutes enacted by the Legislature. [Citation.]"

Defendants state in their brief: "Beginning in 1965 in *Griswold* v. *Connecticut,* 381 U.S. 479, the United States Supreme Court began to adumbrate the vague contours of a constitutional right of privacy bottomed in the general provisions and penumbra of the Second, Fourth and Fifth Amendments of the Constitution but to be found also in the hitherto unnoticed Ninth Amendment."

The Ninth Amendment to the federal Constitution reads: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

Defendants suggest an interpretation of the Ninth Amendment that holds out untold promise to anyone who might wish to urge what he claims as a fundamental right reserved to the people, and who can point out the failure to mention it in the Constitution as proof of its existence.[6] [7]

---

[6]Much as the fabled Irishman pointed to the absence of wiring in ancient buildings in Ireland as proof that the ancient Irish had wireless telegraphy.

[7]The opinion of the court in *Griswold* v. *Connecticut,* 381 U.S. 479, 493 [14 L.Ed. 2d 510, 520, 85 S.Ct. 1678, 1686-1687], written by Justice Douglas, makes passing mention of the Ninth Amendment and quotes it, but does not state what its penumbra is. Justice Goldberg, in a separate concurrence, stated: "[T]he Ninth Amendment simply lends strong support to the view that the 'liberty' protected by the Fifth and Fourteenth Amendments from infringement by the Federal Government or the States is not restricted to rights specifically mentioned in the first eight amendments. [Citation.]

"In determining which rights are fundamental, judges are not left at large to decide cases in light of their personal and private notions. Rather, they must look to the 'traditions and [collective] conscience of our people' to determine whether a principle

In any event, the practice of oral copulation in a public place has not yet been declared to be a fundamental right.

■ Recognizing that the commission of lewd acts in a public place may be the subject of criminal sanctions, defendants argue the subject is adequately covered by Penal Code section 647, subdivision (a), which defines a misdemeanor, so that, it is argued, to make a felony of the more specifically defined crime of section 288a is unreasonable. Thus we are asked to equate the conduct proscribed by section 288a with the less reprehensible conduct described in *People* v. *Mesa*, 265 Cal.App.2d 746, 748 [71 Cal.Rptr. 594], or, in the instant case, the action taken by Dill toward the police officer, which was conduct coming within the proscription of section 647, subdivision (a).

In his book Enforcement of Morals, the late Lord Justice Devlin expressed this opinion: "Since the gravity of the crime is also a proper consideration, a distinction might well be made in the case of homosexuality between the lesser acts of indecency and the full offence . . . ." Here, again, it is for the Legislature to say whether the distinction between the conduct justifies the different penalty.

■ The real thrust of defendants' argument is that oral copulation is and should be recognized as a socially acceptable practice. When, therefore, they speak of a constitutional right to privacy or a right to be protected from an unconstitutional deprivation of their right to liberty, they seek, in effect, judicial repeal, actually, for social reasons, but under the handy

---

is 'so rooted [there] . . . as to be ranked as fundamental.' [Citation.] The inquiry is whether a right involved 'is of such a character that it cannot be denied without violating those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" . . .' [Citation.]"

Justice Black, in dissent, had this to say, at pages 519-520 [14 L.Ed.2d at page 536, 85 S.Ct. at page 1701]: "[T]he very material quoted by my Brother GOLDBERG shows that the Ninth Amendment was intended to protect against the idea that 'by enumerating particular exceptions to the grant of power' to the Federal Government, 'those rights which were not singled out, were intended to be assigned into the hands of the General Government [the United States], and were consequently insecure.' That Amendment was passed, not to broaden the powers of this Court or any other department of 'the General Government,' but, as every student of history knows, to assure the people that the Constitution in all its provisions was intended to limit the Federal Government to the powers granted expressly or by necessary implication. If any broad, unlimited power to hold laws unconstitutional because they offend what this Court conceives to be the '[collective] conscience of our people' is vested in this Court by the Ninth Amendment, the Fourteenth Amendment, or any other provision of the Constitution, it was not given by the Framers, but rather has been bestowed on the Court by the Court."

guise of a vaguely defined constitutional right, of a law the repeal of which by the Legislature on social grounds has not been brought about.[8]

That, of course, echoes the argument of the congenital homosexual to whom that is natural which the vast majority of the population deems unnatural. However, there are those also who are described as "perverts who have turned to homosexual practices entirely of their own free will." (St. John-Stevas, Law and Morals, p. 119.)[9]

Arguments in the briefs based upon the claimed prevalence of occasional homosexual practice, which, if they have a basis in fact, must be based upon information which has resulted from a widespread waiver of the right to marital privacy, go to the social policy upon which the statute is based.

The philosophical, sociological and biological arguments, and those based upon the treatment of such conduct in other countries, are proper to be addressed to the Legislature. (*People* v. *Massey,* 137 Cal.App.2d 623, 625 [290 P.2d 906].)[10]

---

[8]Defendants' brief states: "[I]t is not the privacy of the act that touches it with a fundamental or protected character. It is the privileged and personal core of some human acts that touches off this newly devised constitutional approach to the regulation of such conduct. It is a regard for the autonomy of a selected class of human concerns which, barring special circumstances or disability involving a captive public or unwilling participants, that permits the citizen to respond to his human and otherwise harmless needs with impunity. It may be that the rubric 'privacy' is not the best chosen (perhaps 'liberty,' especially because it is linguistically explicit in the Fifth and Fourteenth Amendments, is a better choice). It may be that no English word quite captures the notion of protected autonomy—just as no English word corresponds to *rechtstaat* or *droit,* in capturing the flavor of the specifically American notion of a constitutional regime of human rights. Whether the human right involved here is conceived of in terms of privacy, liberty or autonomy, it nonetheless can only be intruded upon by a regulation serving a *compelling* state interest."

[9]Where the act is performed in a public place, the applicability of the statute could hardly be made dependent upon which of those classes a defendant belonged to, even if defendants here were identtified as congenital homosexuals. Identification as such is no more inherently impossible than identification of a conscientious objector under selective service laws.

[10]Some of those arguments are a part of the continuing controversy as to the extent of the permissible relationship between law and morals.

On the one side are the Benthamites adhering to their master's dictum: "All actions, whether public or private, fall under the jurisdiction of morals. It is a guide which leads the individual, as it were, by the hand through all the details of his life, all his relations with his fellows. Legislation cannot do this; and, if it could, it ought not to exercise a continual interference and dictation over the conduct of men.

"Morality commands each individual to do all that is advantageous to the community, his own personal advantage included. But there are many acts useful to the community which legislation ought not to command. There are also many injurious

The additional contentions raised in the brief of amicus curiae suggest the Constitution should be seen as declaring that the right to sexual gratification by whatever means and under whatever circumstances shall not be denied to the people; and that the privacy to which the derived right of privacy adheres is an aura that surrounds the individual wherever he may be, as though he were enveloped in a cloak of invisibility.[11]

If that is the purport of the argument, its absurdity is shown by a consideration of certain types of sexual indulgence.

The flagellant imposing pain upon a willing recipient, and the masochist receiving it, might claim a right of privacy in their sex life as fundamental,

actions which it ought not to forbid, although morality does so. In a word, legislation has the same centre with morals, but it has not the same circumference.

"There are two reasons for this difference: 1st. Legislation can have no direct influence upon the conduct of men, except by punishments. Now these punishments are so many evils, which are not justifiable except so far as there results from them a greater sum of good. But, in many cases in which we might desire to strengthen a moral precept by a punishment, the evil of the punishment would be greater than the evil of the offence. The means necessary to carry the law into execution would be of a nature to spread through society a degree of alarm more injurious than the evil intended to be prevented." (Bentham, The Theory of Legislation, ch. 12, p. 60.)

Bentham dealt with the type of conduct proscribed by section 288a under the heading "Offenses Against Taste," and found it a positive good as a means of population control. Elsewhere he considered whether incest within the family was to be condemned by balancing the arguments for and against.

Other writers on the subject find that the criminal law punishes conduct that is not immoral, in the sense of not being good. See Goodhart, English Law and the Moral Law, at pages 83-84: "When we turn to the criminal law, we find that the danger is not that we may underrate the influence of the moral law, but that we may exaggerate it. Because criminal law in its more severe aspect punishes what are generally regarded as wicked acts, we are inclined to think that the criminal law is 'morality with teeth in it,' and that its primary purpose must be to make men good. Any attempts to define criminal law in terms of morality have, however, failed because even such a crime as treason may not be morally wrong, and the vast majority of minor offences are unrelated to moral fault. A crime can only be defined as an act which is punished by the State. What acts will be so prohibited is a question of public policy." (Cf. Hart, The Morality of the Criminal Law, pp. 32, 33, 36, 37, 39; Lord Devlin, The Enforcement of Morals, pp. 16, 17, 18, 19; St. John-Stevas, Law and Morals, pp. 26, 27; Pound, Law and Morals, pp. 30, 31, 32, 69.)

"The name morality, when standing unqualified or alone, may signify the human laws, which I style positive morality, as considered without regard to their goodness or badness. For example, such laws of the class as are peculiar to a given age, or such laws of the class as are peculiar to a given nation, we style the morality of that given age or nation, whether we think them good or deem them bad." (Austin, The Province of Jurisprudence Determined, p. 125.)

[11]Such a screen of privacy might be compared to a carapace carried about by the individual, or to the tub of Diogenes had he been a peripatetic philosopher instead of a cynic.

but such a claim would not justify the public performance of such acts within the view of unwilling spectators physically present.[12]

The proscription of all such public conduct is well within the province of the Legislature.

The contentions of the defendants other than those based upon the nonestablishment clause of the First Amendment to the federal Constitution, upon its Ninth Amendment, and upon sections 1 and 4 of article I of the California Constitution, have been disposed of by decisions we have cited herein.

The contentions based upon the nonestablishment clause, upon the Ninth Amendment, and upon sections 1 and 4 of article I of the California Constitution, are rejected.

The judgment is reversed.

Ault, J., and Cologne, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied April 17, 1974.

---

[12]While the exhibitionist might wish to be assured that his right to his sex life was fundamental, he might repudiate the adherent right of privacy thereto, if the curtain surrounding its exercise were substantial rather than theoretical.