GARY EARL NEVILLE *v.* STATE OF MARYLAND

[No. 31, September Term, 1980.]

\* \* \*

HOWARD CHESTER KELLY, JR. *v.* STATE OF
MARYLAND

[No. 33, September Term, 1980.]

*Decided June 3, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *J. Robert Johnson, Assistant Public Defender,* on the brief, for appellant Neville. *Barbara Mello* and *Timothy E. Meredith,* with whom were *Robert W. Warfield* and *Corbin, Heller & Warfield, Chartered* on the brief, for appellant Kelly.

*Alice Pinderhughes, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

RODOWSKY, J., delivered the opinion of the Court. DAVIDSON, J., dissents and filed a dissenting opinion at page 386 *infra.*

These appeals in criminal cases which were consolidated for argument in this Court question the constitutionality, primarily on privacy and equal protection grounds, of the Maryland perverted practices statute. For the reasons set forth below, we affirm the convictions.

## I

Appellant Howard Chester Kelly, Jr. (Kelly), then age 18, was tried before a jury in the Circuit Court for Anne Arundel County. His prosecution was initiated on the complaint of a 16-year-old female, Pat. A friend of Kelly, Ronald Holden (Holden), was tried jointly with Kelly.

Pat testified in substance that she was abducted at knife-point by Kelly and Holden from the Harundale Shopping Center in Glen Burnie on the afternoon of Friday, May 5, 1978. Pat said that she was taken by automobile to an abandoned nike missile site where she was raped by Holden and forced to perform fellatio on Kelly. Both Kelly and Holden took the stand and said Pat asked for a ride in their automobile. Each testified that a variety of two party and three party sexual acts were performed with Pat that afternoon, all with her consent and at her instigation. For purposes of the present appeal it is sufficient to note that Kelly testified Pat performed fellatio upon him, in the presence of Holden, outside of an old metal shed which was at one time used to store acid in connection with the former missile installation. There was also defense evidence concerning an admission made by Pat to an acquaintance that Pat picked up the two defendants and had sex with them, after which they abandoned her and that, in order to get revenge for the abandonment, Pat claimed to be the victim of forced sexual acts. Holden and Kelly testified that they left Pat at the site only after she became enraged because they disparaged the quality of her performance.

The jury found Kelly guilty of committing an unnatural and perverted sexual practice in violation of Md. Code (1957, 1976 Repl. Vol., 1980 Cum. Supp.), Art. 27, § 554.[1] Kelly

---

1. The statute in pertinent part provides:

Every person who is convicted of taking into his or her mouth the sexual organ of any other person or animal, or who shall be convicted of placing his or her sexual organ in the mouth of any other person or animal, or who shall be convicted of committing any other unnatural or perverted sexual practice with any other person or animal, shall be fined not more than one thousand dollars ($1,000.00), or be imprisoned in jail or in the house of

was acquitted of the charges of first and second degree rape, of first and second degree sexual offenses (Art. 27, §§ 462, 463, 464 and 464A), of common law assault and battery, and of kidnapping (Art. 27, § 337).[2] By motion supported by an extensive legal memorandum, both filed on the day before trial on the merits commenced, Kelly attacked § 554 as violative of privacy, equal protection, and the prohibition against cruel and unusual punishment. Additionally, exception was taken by Kelly to the refusal to instruct the jury that consent was defensive to the perverted practice charge. This request was predicated on Kelly's argument that a constitutional right of privacy applied to the facts of his case. Kelly was sentenced to one year, service of the sentence was suspended and he was placed on supervised probation for three years. The conviction was affirmed by the Court of Special Appeals. *Kelly v. State,* 45 Md. App. 212, 412 A.2d 1274 (1980). We granted certiorari.

The first of three questions presented by Kelly in his petition for certiorari was "[w]hether the imposition of absolute criminal liability for *private,* consensual sexual conduct infringes a constitutionally protected right of privacy . . . ." [Emphasis added.] This question encompasses, under Md. Rule 813 a, the issue of whether the admitted sexual conduct was "private" for purposes of the asserted constitutional right. Having exercised our discretion to grant Kelly's petition and thereby to afford him a discretionary appeal, the case is treated like every other appeal with respect to the issue of "private" conduct. "And, as in every ordinary direct appeal, the rule is well established that an appellate court will normally affirm a trial court on a ground adequately shown by the record, even though that ground was not the one relied upon by the trial court." *Robeson v. State,* 285 Md. 498, 503-04, 403 A.2d

---

correction or in the penitentiary for a period not exceeding ten years, or shall be both fined and imprisoned within the limits above prescribed in the discretion of the court.

**2.** Holden was likewise convicted only on the perverted practice charge, but has not appealed.

1221, 1224 (1979), *cert. denied,* 444 U.S. 1021, 100 S. Ct. 680, 62 L. Ed. 2d 654 (1980).[3]

The former missile site at which the conduct occurred is approximately two miles south of Fort Smallwood Park and lies east of Fort Smallwood Road which, in this area, may be considered as running north-south. Fronting on the east side of Fort Smallwood Road is a public school, described as comprised of both a lower school and an upper school. The abandoned nike facility lies behind, or east of, the public school. The distance from Fort Smallwood Road to the nike base was estimated to be one-quarter or from one-quarter to one-half mile. A road leads past the public school to the old military compound which is partially fenced and which is used occasionally as a dump. Kelly, Holden and Pat parked their car near the dumping area and at the foot of a "hill" of unspecified elevation. They got out of the car and drank some beer. Each participant testified that there was a pickup truck parked in the vicinity. Two men were scavenging cinder blocks and loading them in the truck. Kelly estimated the pickup truck to be 60 to 70 feet from where they parked. Holden testified that the two men were close enough to enable him to hear their conversation.

On the other side of the hill from the point where the participants' car was parked is a concrete slab on which sits the rusted out metal shed outside of which and in which the sexual activity took place. To the east of the metal shed is the home of the Bolander family. It was identified as also being the Stony Creek Rod and Gun Club. This house is approximately one-half block from the metal shed. The shed is not visible from the Bolander house because the intervening area is wooded. However, a path approximately three feet wide runs from the Bolander home, past the shed, toward the public school. The shed is visible from the path. Mrs. Bolander has seen the shed while using the path to pick up her 9-year-old daughter who attends the Fort Smallwood

---

3. Similarly in No. 31, Neville v. State, the question presented in the petition for certiorari was whether "Article 27, § 554 [is] unconstitutional as applied to consenting adults of the opposite sex acting in private."

School. Also approximately one-half block from the metal shed, but on the other side of the path from the shed, is the skeet shooting area of the rod and gun club. On the afternoon in question, Mrs. Bolander's 9-year-old daughter and her son [4] were searching in the area of the skeet traps for the daughter's mislaid wallet. The 9-year-old daughter came upon Pat after the occurrence and brought her to the Bolander home where Mrs. Bolander telephoned the police.

## II

The prosecution in No. 31 was based upon visual observations by Patrolman Dean Brewer of the Westminster Police Department. Gary Earl Neville (Neville), age 42, was charged in the Circuit Court for Carroll County with indecent exposure and, under § 554, with perverted sexual practice. On Saturday, August 12, 1978, at approximately 3:00 o'clock in the afternoon, Officer Brewer observed Neville and a 27-year-old female, Susan, walking along the railroad tracks which run parallel to Railroad Avenue within the municipal limits of Westminster. The railroad tracks run generally north-south. Officer Brewer had information that Susan had been engaging in perverted practice activities. Anticipating the site to which the two might be going, he drove his marked police car to a furniture store east of, and in the vicinity of, a small wooded area which lies east of the railroad tracks. Officer Brewer proceeded on foot down an incline and took a position approximately 25 feet from a clearing in the wooded area. This clearing, which was four to five feet wide, had pieces of clothing scattered about on the ground. The wooded area was half-moon shaped. Its flat edge ran along the side of the railroad tracks for 75 to 100 feet. There were approximately 40 trees in the wooded area. It was overgrown with sticker bushes of about waist height. A number of paths ran through

---

4. There are two other Bolander children in addition to the 9-year-old daughter. Their ages were 13 and 15 at the time of trial. The record does not disclose the age of the son referred to.

the wooded area to the clearing, including a path which ran from the railroad tracks. The clearing was approximately 10 to 15 feet from the railroad tracks and at an elevation approximately four feet higher than the tracks. Officer Brewer arrived at the area in advance of Neville and Susan. He observed them leave the railroad tracks, walk into the wooded area and lie down on the clothing. The officer moved to a point approximately 15 feet from the subjects and remained in a crouched or kneeling position so as not to be observed. Susan performed fellatio on Neville, after which Officer Brewer arrested both.

Neville was employed by the Rescue Mission in Westminster. While Neville and Susan were in the clearing, two men from the Rescue Mission walked down the railroad tracks to a shopping center and walked back. This route took them within 15 feet of the clearing. The railroad tracks are used by the people at the Mission. By Neville's admission, the tracks are used by a "lot of other people . . . too," because "[i]t's close to the shopping center."

Neville was found guilty only on the perverted practices charge. He was fined $10 and costs, and payment of the fine and costs was suspended. We granted certiorari prior to the consideration by the Court of Special Appeals of Neville's appeal.

### III

There is no universally recognized and accepted definition of the concept of privacy in the sense in which appellants invoke it.[5] We are not here concerned with matters relating to the confidentiality of personal information, nor exclusively with solitude, but rather with concepts of liberty of the individual which are considered to be so fundamental as to be protected from unwarranted governmental interference even though express recognition of the right is

---

5. As briefed and argued, appellants' arguments are predicated upon the Constitution of the United States. No special argument is advanced based upon provisions of the Constitution or Declaration of Rights of Maryland.

not found in the words of a written constitution. *Whalen v. Roe,* 429 U.S. 589, 598-600, 97 S. Ct. 869, 876, 51 L. Ed. 2d 64, 73 (1977). We propose no definition here. Rather, like the scientist, we can best identify the phenomenon by the circumstances under which it has been authoritatively reported to exist after a test conducted in the laboratory of a case which applies the right to actual facts. The Supreme Court recently catalogued its decisions which implicate the right of privacy. While the catalogue is perhaps incomplete, it embraces the decisions principally relied upon by the appellants in the instant cases.

Although "[t]he Constitution does not explicitly mention any right of privacy," the Court has recognized that one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy." *Roe v. Wade,* 410 U.S. 113, 152 [93 S. Ct. 705, 726, 35 L. Ed. 2d 147] (1973). This right of personal privacy includes "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599-600 [97 S. Ct. 869, 876, 51 L. Ed. 2d 64] (1977). While the outer limits of this aspect of privacy have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions "relating to marriage, *Loving v. Virginia,* 388 U.S. 1, 12 [87 S. Ct. 1817, 1823, 18 L. Ed. 2d 1010] (1967); procreation, *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541-542 [62 S. Ct. 1110, 1113-1114, 86 L. Ed. 1655] (1942); contraception, *Eisenstadt v. Baird,* 405 U.S. at 453-454 [92 S. Ct. at 1038-1039]; *id.,* at 460, 463-465 [92 S. Ct. at 1042, 1043-1044] (White, J., concurring in result); family relationships, *Prince v. Massachusetts,* 321 U.S. 158, 166 [64 S. Ct. 438, 442, 88 L. Ed. 645] (1944); and child rearing and education, *Pierce v. Society of Sisters,* 268 U.S. 510, 535 [45 S. Ct. 571, 573, 69 L.

Ed. 1070] (1925); *Meyer v. Nebraska* [262 U.S. 390, 399 (1923)] [43 S. Ct. 625, 67 L. Ed. 1042]." *Roe v. Wade, supra,* at 152-153 [93 S. Ct. at 726]. See also *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639-640 [94 S. Ct. 791, 796-797, 39 L. Ed. 2d 52] (1974). [*Carey v. Population Services International,* 431 U.S. 678, 684-85, 97 S. Ct. 2010, 2016, 52 L. Ed. 2d 675, 684 (1977).]

As recently as 1976 this Court observed that it is "clear that the Supreme Court has yet to extend the right of privacy much beyond the context of intimate relationships." *Montgomery Co. v. Walsh,* 274 Md. 502, 513, 336 A.2d 97, 105 (1975), *appeal dismissed,* 424 U.S. 901, 96 S. Ct. 1091, 47 L. Ed. 2d 306 (1976). *See also Doe v. Commander, Wheaton Police Dept.,* 273 Md. 262, 272, 329 A.2d 35, 41-42 (1974).

The Supreme Court's decision in *Carey* [6] makes plain that the Court considers it to be an open question whether the right of privacy applies to all of the combinations and permutations which can fall under the general heading of "adult sexual relations." Following a reference to the compelling state interest test for the justification of certain state regulation and to the requirement that such a regulation must be narrowly drawn to express only the legitimate state interests at stake, as those concepts were applied in *Roe v. Wade,* the Court inserted the following footnote:

> Contrary to the suggestion advanced in MR. JUSTICE POWELL's opinion, we do not hold that state regulation must meet this standard "whenever it implicates sexual freedom," . . . or "affect[s] adult sexual relations," . . . but only when it "burden[s] an individual's right to decide to prevent conception or

---

**6.** *Carey* invalidated a New York statute which made it criminal for any person to sell or distribute contraceptives to persons under 16, for one other than a licensed pharmacist to distribute contraceptives to persons 16 or over and for anyone, including licensed pharmacists, to advertise or display contraceptives.

terminate pregnancy by substantially limiting access to the means of effectuating that decision." ... As we observe below, "the Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating [private consensual sexual] behavior among adults," n.17, *infra,* and we do not purport to answer that question now. [*Carey v. Population Services International, supra,* 431 U.S. at 688 n.5, 97 S. Ct. at 2018 n.5, 52 L. Ed. 2d at 687 n.5.][7]

The Supreme Court's careful limitation to the facts before it of a holding that a right of privacy applies, which is manifested in *Carey,* was perceived by this Court in earlier Supreme Court privacy decisions. In *Montgomery Co. v. Walsh, supra,* we referred to the emphasis in *Roe v. Wade* "that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty' are included in the constitutional guarantee of personal privacy" and we refer to the language of *Eisenstadt v. Baird* which speaks of freedom " 'from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.' " We discerned that if "these pronouncements hint that the constitutional right of privacy is of limited scope and not to be lightly applied, *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S. Ct. 2628, 37 L. Ed. 2d 446 (1973), makes it explicit." 274 Md. at 512-13, 336 A.2d at 105.

*Slaton* was the review of a Georgia decision which held that an injunction could issue to prohibit the exhibition in an adult movie theatre of films depicting scenes of simulated fellatio, cunnilingus and group sexual intercourse. The theatre argued, citing *Stanley v. Georgia,* 394 U.S. 557, 89

---

7. The court obviously took pains to insert the above-quoted disclaimer. Footnote 17 referred to appears in part IV of the opinion. Only four Justices joined in part IV. However, the above-quoted note, which is partially duplicative of note 17, is inserted in part III of the opinion in which 6 Justices joined.

S. Ct. 1243, 22 L. Ed. 2d 542 (1969), that state regulation of access to obscene material by consenting adults violates the constitutionally protected right to privacy enjoyed by its customers. A five member majority of the Court, referring to " 'only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty",' " stated that this "privacy right encompasses and protects the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing." *Slaton, supra,* 413 U.S. at 65, 93 S. Ct. at 2639, 37 L. Ed. 2d at 462. In rejecting an argument seeking an expansion to *Slaton's* facts of the privacy right recognized in *Stanley,* the Supreme Court said:

> If obscene material unprotected by the First Amendment in itself carried with it a "penumbra" of constitutionally protected privacy, this Court would not have found it necessary to decide *Stanley* on the narrow basis of the "privacy of the home," which was hardly more than a reaffirmation that "a man's home is his castle." . . . Moreover, we have declined to equate the privacy of the home relied on in *Stanley* with a "zone" of "privacy" that follows a distributor or consumer of obscene materials wherever he goes. [cit. om.] The idea of a "privacy" right and a place of public accommodation are, in this context, mutually exclusive. Conduct or depictions of conduct that the state police power can prohibit on a public street do not become automatically protected by the Constitution merely because the conduct is moved to a bar or a "live" theater stage, any more than a "live" performance of a man and woman locked in a sexual embrace at high noon in Times Square is protected by the Constitution because they simultaneously engage in a valid political dialogue. [413 U.S. at 66-67, 93 S. Ct. at 2640, 37 L. Ed. 2d at 462-63.]

In a footnote to the foregoing passage, the Court recognized the distinction between the solitude aspects of privacy and its application to intimate relationships.

> The protection afforded by *Stanley v. Georgia* . . . is restricted to a place, the home. In contrast, the constitutionally protected privacy of family, marriage, motherhood, procreation, and child rearing is not just concern with a particular place, but with a protected intimate relationship. Such protected privacy extends to the doctor's office, the hospital, the hotel room, or as otherwise required to safeguard the right to intimacy involved. . . . *Obviously, there is no necessary or legitimate expectation of privacy which would extend to marital intercourse on a street corner or a theater stage.* [Emphasis supplied.]

Professor Tribe has advanced the theory that harms existing only in the mind of the beholder do not suffice to support state action which infringes on a right of privacy. In focusing on possible limits of that principle he has stated that "perhaps the most basic is that, when the affront seems offensive enough in relation to the importance of the choice to the person making it, the community may require at least that the choice be made in some less obtrusive way — at home, perhaps, or a nudist camp, but not on the main street at high noon." L. Tribe, *American Constitutional Law* 984 (1978). *See also* Richards, *Unnatural Acts and The Constitutional Right to Privacy: A Moral Theory,* 45 Fordham L. Rev. 1281, 1333-34 (1977).

A possible vehicle for addressing directly the intersection of state power and personal sexual conduct was presented to the Supreme Court in the appeal from *Doe v. Commonwealth's Attorney for City of Richmond,* 403 F. Supp. 1199 (E.D. Va. 1975), a decision of a three judge district court [8] which sustained the constitutionality of the Virginia sodomy statute. The challenge was by male plaintiffs who averred, *inter alia,* that the statute unjustifiably invaded their rights of privacy when applied to

---

**8.** Opinion by Senior Circuit Judge Bryan, joined by District Judge Lewis, with District Judge Merhige dissenting.

active and regular homosexual relations with another adult male, consensually and in private. They sought to enjoin allegedly threatened prosecution for violation of that law. The district court decision was summarily affirmed. 425 U.S. 901, 96 S. Ct. 1489, 47 L. Ed. 2d 751 (1976).

It is clear from the foregoing review that there is no holding by the Supreme Court that the right of privacy applies to conduct of the type prohibited by Md. Code, Art. 27, § 554. Petitioner Kelly, however, contends that the rationale of the Court's privacy decisions to date necessarily leads to the conclusion that "private consensual sexual conduct" is constitutionally immunized from criminal liability. Neville asserts that § 554 is unconstitutional "as applied to consenting adults of the opposite sex acting in private." [9] While the questions presented in the petitions for certiorari have characterized the conduct here as being "private," and while that characterization may well be properly applied to the locations here involved in other contexts, the private nature of particular conduct in a given location for constitutional right of privacy purposes is a matter of degree determined by all of the circumstances. Here, where the conduct, even if consensual, is fellatio, and even if we assume, *arguendo*, that constitutional personal autonomy could under some circumstances protect that sexual act, we do not believe that constitutional personal autonomy prohibits enforcement of § 554 under the facts of the present cases.

After the *Griswold* decision, criminal statutes which flatly and in terms without exception prohibit fellatio have been frequently challenged on privacy grounds. The clear majority of consensual fellatio cases which have considered arguments based on personal autonomy have looked to the location and other circumstances to determine if any right of

---

**9.** The differences in the scope of the claimed right as expressed by the present petitioners highlight some of the factual variations that may arise. These include the type of sexual conduct, the legal status of each participant, the number of the participants, their sex and their legal relationship, if any, to one another, in addition to the place where the conduct occurred.

privacy could apply. The argument has been rejected in *Connor v. Hutto,* 516 F.2d 853, 855 (8th Cir.), *cert. denied,* 423 U.S. 929, 96 S. Ct. 278, 46 L. Ed. 2d 257 (1975) ("The 'right of privacy' rationale stressed by appellant has not been extended by the [Supreme] Court to include the right to engage in the conduct for which appellant was convicted here, namely, sodomy in a car parked on a public highway."); *Carter v. State,* 255 Ark. 225, 500 S.W.2d 368 (1973), *cert. denied,* 416 U.S. 905, 94 S. Ct. 1610, 40 L. Ed. 2d 110 (1974) (11 p.m. in car parked on the well lighted lot of a public rest and tourist information facility adjacent to an interstate highway); *Connor v. State,* 253 Ark. 854, 490 S.W.2d 114, *appeal dismissed,* 414 U.S. 991, 94 S. Ct. 342, 38 L. Ed. 2d 230 (1973) (same facts as *Connor v. Hutto, supra*); *People v. Baldwin,* 37 Cal. App. 3d 385, 112 Cal. Rptr. 290 (1974) (3:40 a.m. in public restroom within view of a plain clothes policeman); *People v. Parker,* 33 Cal. App. 3d 842, 109 Cal. Rptr. 354 (1973) (professional actors filming pornographic movies); *People v. Drolet,* 30 Cal. App. 3d 207, 105 Cal. Rptr. 824 (1973) (live performance at San Francisco night club); *Stewart v. United States,* 364 A.2d 1205 (D. C. App. 1976) (1:15 a.m. along a bank of the C&O Canal near 30th and M Streets, (N.W.); *United States v. Buck,* 342 A.2d 48 (D. C. App. 1975) (1:30 a.m. in a public wooded area at 29th Street and Pennsylvania Avenue, N.W.); *United States v. McKean,* 338 A.2d 439 (D. C. App. 1975) (in cubicles of a "health club"; immaterial whether doors of cubicles were open or closed because of the nature of the particular establishment); *Harris v. United States,* 315 A.2d 569 (D. C. App. 1974) (en banc) (same "health club" as in *McKean, supra,* held to be a disorderly house open to the public because membership could be obtained with minimum formality and modest fees); and *State v. Jarrell,* 24 N.C. App. 610, 211 S.E.2d 837, *cert. denied* and *appeal dismissed,* 286 N.C. 725, 213 S.E.2d 724 (1975) (public restroom in public park). We hold that Md. Code, Art. 27, § 554 was constitutionally applied to each petitioner. Each petitioner engaged in this intimate sexual activity during daylight hours in a place which was out of doors, which was in a well populated community, and which

was equally as accessible to uninvited other persons as it was to petitioner.[10]

Kelly asserted at oral argument that the issue of whether his conduct was private was not tried and decided by the trial court. Md. Rule 885. The contention is not supported by the record. In his memorandum in support of his motion for dismissal, Kelly argued that the missile base was a "secluded spot, far off the beaten path" so that the parties had a reasonable expectation of privacy. The motion was denied.

Neville additionally advanced at oral argument a contention based on his acquittal of a companion charge of indecent exposure arising out of the same incident. He had argued to the trial court that the indecent exposure charge should fall as a matter of law because the conduct did not occur in a public place. The trial court, sitting non-jury, acquitted Neville on the indecent exposure count by reference to *Messina v. State,* 212 Md. 602, 605, 130 A.2d 578, 579-80 (1957). It reasoned that an essential element of the crime of indecent exposure was that the exposure must be seen or be likely to be seen by a casual observer and then held that Officer Brewer, who was "required to literally stalk the Defendant . . . was not a 'casual observer' as defined in *Messina.*"[11] At the same time the trial court rejected Neville's argument based on a constitutional right of privacy. Even if it is assumed that the facts in Neville's case did not establish all of the elements of indecent exposure, the

---

**10.** We need not address the State's argument, applicable to Kelly, which is based upon the presence of Holden and on the opinion of a divided *en banc* court in Lovisi v. Slayton, 539 F.2d 349 (4th Cir.), *cert. denied sub nom.* Lovisi v. Zahradnick, 429 U.S. 977, 97 S. Ct. 485, 50 L. Ed. 2d 585 (1976). In that case habeas corpus relief was denied to a husband and wife who engaged in fellatio in the bedroom of their home in the presence of an invited male third party who had responded to the couple's magazine advertisement. It was held that the presence of the onlooker dissolved the couple's reasonable expectation of privacy. *But see* Eichbaum, *Lovisi v. Slayton: Constitutional Privacy and Sexual Expression,* 10 Colum. Human Rights L. Rev. 525, 537-38 (1978-79), and Note, *The Marital Right of Privacy Does Not Protect a Husband and Wife Performing Sodomy in the Presence of a Third Person,* 45 Geo. Wash. L. Rev. 839 (1977).

**11.** The indecent exposure charge is not before us and we express no opinion on this application of *Messina.*

legislatively created crime of perverted practice under § 554 does not, by its terms, include an element relating to the type of place where the conduct must occur in order for it to be statutorily prohibited. A greater degree of circumstances of privacy than is presented here would be required in order to support the private conduct element of an argument that Neville's fellatio was not criminal under § 554 because it was the exercise of a constitutionally protected right of personal autonomy.

Similarly, because § 554 makes it a violation of the criminal law of Maryland to place one's sexual organ in the mouth of any other person, whether the act is voluntary or involuntary is immaterial at the statutory level of analysis. *Gooch v. State,* 34 Md. App. 331, 367 A.2d 90 (1976), *cert. denied,* 280 Md. 735 (1977). Kelly argues that the trial court erred in refusing to instruct the jury that consent on the part of Pat was defensive to the charge that he violated § 554. The foundation for this requested instruction necessarily lies in Kelly's constitutional argument which would prevent literal application of § 554 to sexual conduct which is the exercise of rights of personal autonomy between consenting persons in private. Inasmuch as the claimed constitutional right would not apply to the circumstances in Kelly's case, even if the fellatio were consensual,[12] there was no error in refusing the requested instruction.

Kelly next contends that § 554 is facially unconstitutional because of overbreadth. It is said that the statute by its terms can embrace private sexual activity between consenting adults, a result said to be beyond the police power of the State as limited by due process. Kelly submits that this Court should either strike down § 554 in its entirety, or construe § 554 so as to exclude from its application sexual conduct of consenting adults in private. Even if we were to assume that § 554 could not constitutionally be applied in

---

12. By assuming, *arguendo,* a federal constitutional right of privacy applicable under some circumstances to fellatio, we do not imply, from the facts or arguments in Kelly's case, any opinion as to a minimum age at which a person might first become constitutionally protected to engage in this particular sexual conduct.

certain situations, that is not a basis for voiding it in whole or in part where, as here, it is validly applied to the facts before the court. Statutes prohibiting oral sodomy, which could be read to include conduct between consenting adults, have not been struck down where the statute was validly applied to the defendant because his conduct was not in private,[13] or took place in prison,[14] or was with a minor[15] or was accomplished by force.[16]

Neville's argument that he was only engaged in a form of birth control is a variation on the scenario of copulation during political dialogue in Times Square and is not applicable to the circumstances of his case.

## IV

The equal protection contention of Kelly is twofold. He says that his conviction is discriminatory *vis-à-vis* married persons. Both he and Neville also argue that the absence from Maryland law of a criminal sanction for fornication makes § 554 invalid.

The outline of the argument based on comparison to married persons is that § 554 makes criminal oral sex

---

**13.** People v. Baldwin, *supra;* Stewart v. United States, *supra;* Harris v. United States, *supra;* United States v. McKean, *supra;* United States v. Buck, *supra* and State v. Jarrell, *supra. See also* Buchanan v. Batchelor, 308 F. Supp. 729 (N.D. Tex. 1970), *vacated on other grounds,* 401 U.S. 989, 91 S. Ct. 1221, 28 L. Ed. 2d 526 (1971) as to one plaintiff arrested for sodomy in a public rest room.

**14.** United States v. Brewer, 363 F. Supp. 606 (M.D. Pa.), *aff'd mem.,* 491 F.2d 751 (3d Cir. 1973), *cert. denied,* 416 U.S. 990, 94 S. Ct. 2399, 40 L. Ed. 2d 768 (1974); Washington v. Rodriguez, 82 N.M. 428, 483 P.2d 309 (Ct. App. 1971). *See* People v. Frazier, 256 Cal. App. 2d 630, 64 Cal. Rptr. 447 (1967).

**15.** State v. Worthington, 582 S.W.2d 286 (Mo. App. 1979); Jones v. State, 85 Nev. 411, 456 P.2d 429 (1969).

**16.** Swikert v. Cady, 381 F. Supp. 988 (E.D. Wis. 1974), *aff'd mem.,* 513 F.2d 635 (7th Cir. 1975); People v. Sharpe, 183 Colo. 64, 514 P.2d 1138 (1973); State v. Thompson, 221 Kan. 165, 558 P.2d 1079 (1976); State v. Levitt, 118 R.I. 32, 371 A.2d 596 (1977); Jones v. State, 55 Wis. 2d 742, 200 N.W.2d 587 (1972); and Pruett v. State, 463 S.W.2d 191 (Tex. Cr. App. 1970), *appeal dismissed,* 402 U.S. 902, 91 S. Ct. 1379, 28 L. Ed. 2d 643, *reh. denied,* 403 U.S. 912, 91 S. Ct. 2203, 29 L. Ed. 2d 690 (1971). *See also* Byrd v. State, 65 Wis. 2d 415, 222 N.W.2d 696 (1974).

between persons who are lawfully married to each other but that such a prohibition violates their privacy rights.[17] This, in turn, is claimed to result in two classes of persons under the statute, married persons who may not be prosecuted, and unmarried persons who are subject to prosecution. Such a distinction, Kelly states, is offensive to equal protection.[18]

This argument in essence asks us to read into § 554 an exception based upon one line of cases, only to invalidate the statute, as so construed, under another line of cases. However, we perceive no violation of equal protection. Were a married couple to be prosecuted for engaging in perverted practice at a place and under circumstances similar to those of Kelly's case, we are satisfied, for the reasons stated in Part III of this opinion, that marriage would not be a defense and that any possible right of privacy which the couple might otherwise have would not apply. There is no deprivation of equal protection of the law if "all persons who are in like circumstances or affected alike are treated under the laws the same . . . ." *Salisbury Beauty Schools v. State Board of Cosmetologists,* 268 Md. 32, 60, 300 A.2d 367, 383 (1973).

It is further asserted that petitioners' rights to equal protection are violated by § 554 because a person who

---

**17.** A number of courts have held, or strongly implied, that the general prohibition of a perverted practices or oral sodomy statute cannot be applied to consenting married persons acting with each other in private, based on the constitutional right of privacy. *See* Lovisi v. Slayton, *supra;* Cotner v. Henry, 394 F.2d 873 (7th Cir.), *cert. denied,* 393 U.S. 847, 89 S. Ct. 132, 21 L. Ed. 2d 118 (1968); Doe v. Commonwealth's Att'y for City of Richmond, *supra;* Dixon v. State, 256 Ind. 266, 268 N.E.2d 84 (1971); State v. Elliott, 89 N.M. 305, 551 P.2d 1352 (1976); State v. Poe, 40 N.C. App. 385, 252 S.E.2d 843 (1979), *appeal dismissed,* 445 U.S. 947, 100 S. Ct. 1593, 63 L. Ed. 2d 782 (1980); Canfield v. State, 506 P.2d 987 (Okla. Cr. App. 1973), *appeal dismissed,* 414 U.S. 991, 94 S. Ct. 342, 38 L. Ed. 2d 230, *reh. denied,* 414 U.S. 1138 (1974); Warner v. State, 489 P.2d 526 (Okla. Cr. App. 1971); State v. Mattera, R.I., 415 A.2d 176 (1980); State v. Santos, R.I. , 413 A.2d 58 (1980); Lee v. State, 505 S.W.2d 816 (Tex. Cr. App. 1974); Turner v. State, 497 S.W.2d 593 (Tex. Cr. App. 1973); Pruett v. State, 463 S.W.2d 191 (Tex. Cr. App. 1970), *appeal dismissed,* 402 U.S. 902, 91 S. Ct. 1379, 28 L. Ed. 2d 643 (1971).

**18.** The highest courts of at least two states have struck down on equal protection grounds an oral sodomy statute which on its face excluded from the prohibition persons married to each other. People v. Onofre, 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936 (1980), *cert. denied,* 49 U.S.L.W. 3864 (U.S. May 19, 1981) (Nos. 80-1634, 80-1710); Commonwealth v. Bonadio, 490 Pa. 91, 415 A.2d 47 (1980).

fornicates, under circumstances otherwise similar to those here, is not subject to criminal prosecution for that sexual conduct. We consider first the standard for review. Neville rests on the rational relation test. Kelly seeks strict scrutiny and, only alternatively, a rational basis test. Inasmuch as we have already held that no fundamental right of privacy was infringed in these cases, the basis for contending for a strict scrutiny standard is lacking. After argument in the instant cases *Attorney General of Maryland v. Waldron* was decided, 289 Md. 683, 426 A.2d 929 (1981). There Judge Digges distilled from the Supreme Court decisions and elucidated for this Court a third category of equal protection analysis which requires a fair and substantial relation between the statute under consideration and the legitimate objective of the police power for which it was enacted. This standard applies "when important personal rights, not yet held to merit strict scrutiny but deserving of more protection than a perfunctory review would accord, are affected by a legislative classification," in which case "a court should engage in a review consonant with the importance of the personal right involved." *Id. at* 713, 426 A.2d at 946. The relatively open fellatio in these cases can hardly be the exercise of an important personal right.

The rational relation test applies. Under that test, "[t]he distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal." *McDonald v. Board of Election Commissioners of Chicago,* 394 U.S. 802, 809, 89 S. Ct. 1404, 1408, 22 L. Ed. 2d 739, 745 (1969). The Supreme Court "has made clear that a legislature need not 'strike at all evils at the same time or in the same way' . . . ." *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S. Ct. 715, 725, 66 L. Ed. 2d 659, 670 (1981) (quoting *Semler v. Oregon State Board of Dental Examiners,* 294 U.S. 608, 610, 55 S. Ct. 570, 571, 79 L. Ed. 1086 (1935)). One valid objective of a perverted practices or sodomy statute is the protection of public morality. Note, *The Constitutionality of Laws Forbidding Private Homosexual*

*Conduct,* 72 Mich. L. Rev. 1613, 1631 (1974); *see also Paris Adult Theatre I v. Slaton, supra,* 413 U.S. at 59-60 [93 S. Ct. at 2636, 37 L. Ed. 2d at 458] ("[t]here is a 'right of the Nation and of the States to maintain a decent society . . . .' *Jacobellis v. Ohio,* 378 U.S. 184, 199 [84 S. Ct. 1676, 1684, 12 L. Ed. 2d 793] (1964) (dissenting opinion [of Chief Justice Warren])"). No more is required for § 554 to be valid than that the General Assembly could reasonably have concluded that where the sexual activity is fellatio as contrasted with vaginal copulation, there is a greater risk of a member of the public being affronted by coming upon a quick and casual sexual liaison in a place equally as accessible to the uninvited and unwilling viewer as to the participants.

Petitioners' argument is much like one which has been advanced in marihuana cases where defendants have argued that equal protection of the laws has been denied because a legislative body has not also proscribed possession or use of alcohol or tobacco. The argument has regularly been rejected on the ground that a legislative body is free to recognize degrees of harm, and may confine its restrictions to instances where it determines the need for them is clearest. *E.g., United States v. Bergdoll,* 412 F. Supp. 1308, 1313 (D. Del. 1976); *Ravin v. State,* 537 P.2d 494, 512 (Alaska 1975); *State v. Renfro,* 56 Hawaii 501, 542 P.2d 366, 369-70 (1975); *Ill. NORML, Inc. v. Scott,* 23 Ill. Dec. 303, 66 Ill. App. 3d 633, 383 N.E.2d 1330, 1336 (1978); *Commonwealth v. Leis,* 355 Mass. 189, 243 N.E.2d 898, 905 (1969); *State ex rel. Zander v. District Court,* 591 P.2d 656, 661 (Mont. 1979) and *State v. Smith,* 93 Wash. 2d 329, 610 P.2d 869, 876, *cert. denied,* 449 U.S. 873, 101 S. Ct. 213, 66 L. Ed. 2d 93 (1980).

V

Finally, petitioner Kelly invokes the prohibition against cruel and unusual punishment of the Eighth Amendment of the United States Constitution and argues that Art. 27, § 554 violates two of its aspects. First, Kelly, citing *Robinson v. California,* 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962), contends that the amendment's substantive

limitations on what may be made criminal forbid punishing private sexual expression. The Supreme Court, however, has admonished that this prong of the eighth amendment is "one to be applied sparingly," *Ingraham v. Wright,* 430 U.S. 651, 667, 97 S. Ct. 1401, 1410, 51 L. Ed. 2d 711, 728 (1977), lest courts become the ultimate arbiters of the standards of criminal responsibility. Moreover, *Robinson's* interpretation of the cruel and unusual punishment clause has not been applied beyond the facts of that case. There the Supreme Court held that a statute that made it a crime to "be addicted to the use of narcotics" inflicted cruel and unusual punishment. Subsequently, in *Powell v. Texas,* 392 U.S. 514, 88 S. Ct. 2145, 20 L. Ed. 2d 1254, *reh denied,* 393 U.S. 898 (1968) a plurality of the court held that a chronic alcoholic could be convicted for public drunkenness consistent with the eighth amendment's proscriptions. *Robinson* was said to prohibit punishment only for "mere status" and in the absence of some *actus reus. Id.* at 532-33, 88 S. Ct. at 2154, 20 L. Ed. 2d at 1267-68. The State here has not attempted to punish "mere status," but has imposed a sanction for behavior it deems harmful or offensive to the sensibilities of a large segment of the community. This it is entitled to do under the Eighth Amendment to the United States Constitution.

Second, Kelly, who was placed on three years supervised probation after the imposition of one year imprisonment was suspended, also contends that exposure to ten years imprisonment (the maximum imprisonment under § 554) for committing a perverted practice is grossly disproportionate to the severity of the crime and therefore is cruel and unusual under U.S. Const. amend. VIII. *See Weems v. United States,* 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910). In *Delnegro v. State,* 198 Md. 80, 89-90, 81 A.2d 241, 246 (1951) this Court disclaimed "any right to oppose the judicial power against the legislative power to define crimes and to fix their punishment, except where the power of the Legislature encounters in its exercise a constitutional prohibition, and in such a case an imperative duty is invoked." In Kelly's case the actual punishment

imposed was well below the statutory maximum and affords no basis for relief. *Streat v. State,* 239 Md. 694, 211 A.2d 709 (1965); *Apple v. State,* 190 Md. 661, 668, 59 A.2d 509, 512 (1948).

For the foregoing reasons the judgments are affirmed.

> *Judgment of the Circuit Court for Carroll County in No. 31, Neville v. State, affirmed.*
>
> *Appellant to pay the costs.*
>
> *Judgment of the Court of Special Appeals in No. 33, Kelly v. State, affirmed.*
>
> *Appellant to pay the costs.*

*Davidson, J., dissenting:*

The majority here fails to reach the essential question whether there is a constitutionally-protected right to privacy for private, consensual, sexual activity. Upon a constitutionally-mandated, independent appraisal of the record, the majority finds as a fact that the conduct of both petitioners, Neville and Kelly, occurred in places not sufficiently private to be afforded a constitutional right to privacy, if such a right exists.

Upon my constitutionally-mandated, independent appraisal of the record, I find as a fact that the sexual activity of both Neville and Kelly occurred in a private place.[1] In my view, there is a constitutionally-protected right to privacy for private, consensual, sexual activity.[2] Thus, I would hold that Maryland Code (1957, 1976 Repl. Vol., 1980 Cum. Supp.), Art. 27, § 554, which makes such

---

1. In Kelly's case, the State does not contend that Kelly did not retain a reasonable expectation of privacy despite the presence of a third party (Holden). Therefore, this question need not be considered here.

2. Hereinafter, throughout this dissenting opinion, the term "consensual, sexual activity" refers to consensual, sexual activity engaged in by persons who have capacity to give legally valid consent.

In Kelly's case, the State does not contend that the female involved, who was aged 16, lacked capacity to give legally valid consent to sexual activity. Therefore, this question need not be considered here.

sexual activity a crime, is unconstitutional as applied here. Accordingly, I respectfully dissent.

As long ago as 1891, the United States Supreme Court recognized the existence of a common law right to personal privacy in *Union Pacific Railway Company v. Botsford,* 141 U.S. 250, 251, 11 S. Ct. 1000, 1001 (1891). There Mr. Justice Gray said:

> "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."

In 1928, Mr. Justice Brandeis indicated that the right to privacy might be constitutionally protected. In a dissenting opinion, in *Olmstead v. United States,* 277 U.S. 438, 478, 48 S. Ct. 564, 572 (1928), he said:

> "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized men."

In 1965, in *Griswold v. Connecticut,* 381 U.S. 479, 484-85, 85 S. Ct. 1678, 1681-82 (1965), the Supreme Court held that there is a constitutionally-protected right to privacy. Although the United States Constitution does not explicitly mention the right to privacy, Mr. Justice Douglas, stating that "the right of privacy [is] older than the Bill of Rights," explained:

> "Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one, as we have seen. The Third Amendment in its prohibition against the quartering of soldiers 'in any house' in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.' "

While the Supreme Court in other cases has held that the right to privacy includes the right to make personal decisions relating to marriage, procreation, contraception, abortion, family, and education, that Court has not defined the full scope of that right. In *Carey v. Population Services International,* 431 U.S. 678, 688 n.5, 97 S. Ct. 2010, 2018 n.5 (1977), the Supreme Court said:

> " '[T]he Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating [private consensual sexual] behavior among adults,' n.17, *infra,* and we do not purport to answer that question now."

Accordingly, I agree with the majority that the "Supreme Court's decision in *Carey* makes plain that the Court considers it to be an open question whether the right of privacy applies to all . . . 'adult sexual relations.' "[3]

---

**3.** I recognize that in Doe v. Commonwealth's Attorney for City of Richmond, 403 F. Supp. 1199, 1203 (E.D. Va. 1975), *aff'd mem.,* 425 U.S. 901, 96 S. Ct. 1489-90 (1976), the Supreme Court summarily affirmed a

In *Griswold,* 381 U.S. at 486-87, 85 S. Ct. at 1682, the Supreme Court held that the distribution of contraceptives to married persons could not be prohibited. Inherent in the Supreme Court's determination that married persons have a right to make decisions with respect to the consequence of sexual encounters was the recognition that married persons have the right to have such encounters. Thus, the Supreme Court established that the constitutionally-protected right to privacy includes the intimacies associated with the marital relationship.

In *Eisenstadt v. Baird,* 405 U.S. 438, 453-55, 92 S. Ct. 1029, 1038-39 (1972), the Supreme Court held that the distribution of contraceptives to unmarried persons could not be prohibited. There the Court said:

> "It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the *individual, married or single,* to be free from unwarranted

---

judgment of the United States District Court of the Eastern District of Virginia that upheld the constitutionality of Virginia's sodomy statute as applied to private, sexual activity between consenting males. While the summary affirmance was an adjudication on the merits of the question presented, Hicks v. Miranda, 422 U.S. 332, 343-45, 95 S. Ct. 2281, 2289 (1975), I do not consider it to be binding. The Supreme Court itself has indicated that a summary affirmance affirms the judgment only and not the reasoning of the Court, and, therefore, that "the Court has not hestitated to discard a rule which a line of summary affirmances may appear to have established." Fusari v. Steinberg, 419 U.S. 379, 392, 95 S. Ct. 533, 541 (1975) (Burger C.J., concurring). *See* Mandel v. Bradley, 432 U.S. 173, 176-77, 97 S. Ct. 2238, 2240-41 (1977).

It is important to note that the *Carey* case, which explicitly states that the question whether the Constitution prohibits state statutes that regulate private, consensual, sexual activity, was decided subsequent to *Doe.* In addition, it is important to note that on 18 May 1981 the Supreme Court denied a petition for a writ of certiorari in People v. Onofre, 51 N.Y.2d 476, 415 N.E.2d 936, 434 N.Y.S.2d 947 (1980), *cert. denied,* — U.S. —, 101 S. Ct. 2323 (1981). In *Onofre,* the New York Court of Appeals held a consensual sodomy statute unconstitutional as applied to private, consensual, sexual activity because it unjustifiably interfered with the constitutionally-protected right to privacy.

governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt,* 405 U.S. at 453, 92 S. Ct. at 1038 (emphasis added).

Thus, the Supreme Court made it clear that the right to make decisions with respect to the consequence of sexual encounters, and necessarily to have such encounters, was not limited to married persons. Accordingly, the Supreme Court established that the constitutionally-protected right to privacy includes the intimacies associated with a personal relationship between unmarried persons.

In *Stanley v. Georgia,* 394 U.S. 557, 568, 89 S. Ct. 1243, 1249-50 (1969), the Supreme Court held that the possession of obscene matter within the privacy of a person's home could not be prohibited. There, the Court acknowledged that a person has

"the right to read or observe what he pleases — the right to satisfy his intellectual and *emotional needs* in the privacy of his own home." *Stanley,* 394 U.S. at 565, 89 S. Ct. at 1248 (emphasis added).

Thus, the Supreme Court suggested that the constitutionally-protected right to privacy includes the right to seek sexual gratification by viewing obscene material in the privacy of one's home.

In *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 66 n.13, 93 S. Ct. 2628, 2640 n.13 (1973), the Supreme Court recognized:

"The protection afforded by *Stanley v. Georgia* is restricted to a place, the home. In contrast, the constitutionally protected privacy of family, marriage, motherhood, procreation, and child rearing is not just concerned with a particular place, but with a *protected intimate relationship. Such protected privacy extends* to the doctor's office, the hospital, the hotel room, or as otherwise required *to safeguard the right to intimacy involved."* (Emphasis added) (citation omitted).

Thus, the Supreme Court reiterated that the constitutionally-protected right to privacy includes the intimacies occurring in private that are associated with personal relationships.

All of these cases lead to the conclusion that an unmarried person's decision to seek sexual gratification, even from deviant conduct, and to indulge in acts of sexual intimacy is included within the constitutionally-protected right to privacy. Indeed, this Court, itself, has previously recognized that the Supreme Court has established that the constitutionally-protected right to privacy includes intimate relationships. *Montgomery County, Md. v. Walsh*, 274 Md. 502, 513, 336 A.2d 97, 105 (1975), *appeal dismissed*, 424 U.S. 901, 96 S. Ct. 1091 (1976); *Doe v. Commander, Wheaton Police Dept.*, 273 Md. 262, 272, 329 A.2d 35, 41-42 (1974).

At least one Justice of the Supreme Court has indicated that the constitutionally-protected right to privacy may include private, consensual, sexual activities. Thus, in *California v. LaRue*, 409 U.S. 109, 132 n.10, 93 S. Ct. 390, 404 n.10 (1972), Mr. Justice Marshall, dissenting, has said:

"... I have serious doubts whether the State may constitutionally assert an interest in regulating any sexual act between consenting adults."

Courts in other jurisdictions have held that the right to privacy includes private, consensual, sexual activities. In *State v. Pilcher*, 242 N.W.2d 348, 359 (Iowa 1976), an accused male was convicted under a sodomy statute of performing fellatio with a female in a farm house. The Iowa Supreme Court held the statute unconstitutional, stating:

"We hold section 705.1 in its present form is unconstitutional as an invasion of fundamental rights, such as the personal right of privacy, to the extent it attempts to regulate through use of criminal penalty consensual sodomitical practices performed in private by adult persons of the opposite sex."

In *People v. Onofre,* 51 N.Y.2d 476, 483, 415 N.E.2d 936, 937-38, 434 N.Y.S.2d 947, 948 (1980), *cert. denied,* — U.S. —, 101 S. Ct. 2323 (1981), an accused male was convicted under a consensual sodomy statute of committing acts of deviate sexual intercourse with a 17-year-old male at the accused's home. The New York Supreme Court, Appellate Division, held the statute unconstitutional, stating:

> "Thus it is seen that the concept of personal freedom includes a broad and unclassified group of values and activities related generally to individual repose, sanctuary and autonomy and the individual's right to develop his personal existence in the manner he or she sees fit. Personal sexual conduct is a fundamental right, protected by the right to privacy because of the transcendental importance of sex to the human condition, the intimacy of the conduct, and its relationship to a person's right to control his or her own body. The right is broad enough to include sexual acts between non-married persons and intimate consensual homosexual conduct.

It has been said that 'privacy in the conventional sense (being left alone without anyone observing) is a generally accepted prerequisite to human sexual intercourse and the protection of sexual activity seems to be an important aspect of the constitutional right to privacy cases.' The right to be free from unwarranted governmental intrusions into one's privacy is fundamental." *Onofre,* 72 App. Div. 2d 268, 270-71, 424 N.Y.S.2d 566, 568 (1980) (citations omitted).

The New York Court of Appeals affirmed, stating that the right to privacy is

> "a right of independence in making certain kinds of important decisions, with a concomitant right to conduct oneself in accordance with those decisions, undeterred by governmental restraint...."

That Court concluded:

> "Because the statutes are broad enough to reach noncommercial, cloistered personal sexual conduct of consenting adults . . . we agree with defendants' contention that it violates . . . their right of privacy. . . ." *Onofre,* 51 N.Y.2d at 485, 415 N.E.2d at 938, 939, 434 N.Y.S.2d at 949.

In *State v. Saunders,* 75 N.J. 200, 203, 381 A.2d 333, 334 (1977), an accused male was convicted under a fornication statute of fornicating with two women in a deserted parking lot. The Supreme Court of New Jersey held the statute unconstitutional, stating:

> "We conclude that the conduct statutorily defined as fornication involves, by its very nature, a fundamental personal choice. Thus, the statute infringes upon the right of privacy. Although persons may differ as to the propriety and morality of such conduct and while we certainly do not condone its particular manifestations in this case, such a decision is necessarily encompassed in the concept of personal autonomy which our Constitution seeks to safeguard." *Saunders,* 75 N.J. at 213-14, 381 A.2d at 339.

None of these courts has found a compelling state interest that would justify state regulation of private, consensual, sexual activity. More particularly, factors such as protecting the institution of marriage, upholding public morality by preventing illicit sex, preventing an increase in illegitimate children, preventing venereal disease, and preventing physical harm have been rejected as a sufficient basis for state regulation. *Pilcher,* 242 N.W.2d at 359; *Saunders,* 75 N.J. at 217-20, 381 A.2d at 341-43; *Onofre,* 51 N.Y.2d at 487-92, 415 N.E.2d at 940-42, 434 N.Y.S. 2d at 951-53.

The underlying rationale for this conclusion was stated in *Saunders,* 75 N.J. at 217-19, 381 A.2d at 341-42, as follows:

"Perhaps the strongest reason favoring the law is its supposed relationship to the furtherance of the State's salutary goal of preventing venereal disease. We do not question the State's compelling interest in preventing the spread of such diseases. Nor do we dispute the power of the State to regulate activities which may adversely affect the public health. However, we do not believe that the instant enactment is properly designed with that end in mind. First, while we recognize that the statute would substantially eliminate venereal diseases if it could successfully deter people from engaging in the prohibited activity, we doubt its ability to achieve that result. The risk of contracting venereal disease is surely as great a deterrent to illicit sex as the maximum penalty under this act: a fine of $50 and/or imprisonment in jail for six months. As the Court found in *Carey,* absent highly coercive measures, it is extremely doubtful that people will be deterred from engaging in such natural activities. The Court there rejected the assertion that the threat of an unwanted pregnancy would deter persons from engaging in extramarital sexual activities. We conclude that the same is true for the possibility of being prosecuted under the fornication statute.

Furthermore, if the State's interest in the instant statute is that it is helpful in preventing venereal disease, we conclude that it is counter-productive. To the extent that any successful program to combat venereal disease must depend upon affected persons coming forward for treatment, the present statute operates as a deterrent to such voluntary participation. The fear of being prosecuted for the 'crime' of fornication can only deter people from seeking such necessary treatment.

We similarly fail to comprehend how the State's interest in preventing the propagation of

illegitimate children will be measurably advanced by the instant law. If the unavailability of contraceptives is not likely to deter people from engaging in illicit sexual activities, it follows that the fear of unwanted pregnancies will be equally ineffective.

The last two reasons offered by the State as compelling justifications for the enactment — that it protects the marital relationship and the public morals by preventing illicit sex — offer little additional support for the law. Whether or not abstention is likely to induce persons to marry, this statute can in no way be considered a permissible means of fostering what may otherwise be a socially beneficial institution. If we were to hold that the State could attempt to coerce people into marriage, we would undermine the very independent choice which lies at the core of the right of privacy. We do not doubt the beneficent qualities of marriage, both for individuals as well as for society as a whole. Yet, we can only reiterate that decisions such as whether to marry are of a highly personal nature; they neither lend themselves to official coercion or sanction, nor fall within the regulatory power of those who are elected to govern." (Citations omitted).

A similar rationale was expressed in *Onofre,* 51 N.Y.2d at 490, 415 N.E.2d at 941-42, 434 N.Y.S.2d at 952, as follows:

"In sum, there has been no showing of any threat, either to participants or the public in general, in consequence of the voluntary engagement by adults in private, discreet, sodomous conduct. Absent is the factor of commercialization with the attendant evils commonly attached to the retailing of sexual pleasures; absent the elements of force or of involvement of minors which might constitute compulsion of unwilling participants or of those too young to make an informed choice, and absent too

intrusion on the sensibilities of members of the public, many of whom would be offended by being exposed to the intimacies of others. Personal feelings of distaste for the conduct sought to be proscribed by section 130.38 of the Penal Law and even disapproval by a majority of the populace, if that disapproval were to be assumed, may not substitute for the required demonstration of a valid basis for intrusion by the State in an area of important personal decision protected under the right of privacy drawn from the United States Constitution — areas, the number and definition of which have steadily grown but, as the Supreme Court has observed, the outer limits of which it has not yet marked."

The conclusion that States do not have a compelling interest in regulating private, consensual, sexual activity is further supported by the fact that Legislatures in at least 22 jurisdictions have decriminalized such activity between adults in private. *See* Rivera, *Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States,* 30 Hastings L.J., 799, 950-51 (1979). In addition, the American Law Institute Model Penal Code adopts the view that private, consensual, sexual activity should not ordinarily be subject to criminal sanction. Model Penal Code § 213.2 (Proposed Official Draft 1962). *See* Model Penal Code § 207.5, Comment (Tent. Draft No. 5, 1956).

I am persuaded that the constitutionally-protected right to privacy includes the fundamental right to decide to engage and then to engage in private, consensual, sexual activity. I am further persuaded that there is no compelling State interest that justifies State regulation of such activity. To the extent that Art. 27, § 554 in its present form regulates private, consensual, sexual activity, it unjustifiably interferes with a fundamental personal right. Accordingly, I would hold it unconstitutional as applied to private, consensual, sexual activity.

I do not agree with the majority that "the private nature of particular conduct in a given location for constitutional right of privacy purposes is a matter of degree determined by all of the circumstances." In my view, the majority here establishes a new standard for determining whether a given intimate act is to be afforded constitutional protection. In essence, it determines that the nature of the conduct and the degree of privacy of the location are both factors to be taken into account and that the more intimate the conduct, the greater the degree of privacy required to afford constitutional protection to a given intimate act. None of the cases relied upon by the majority articulates or utilizes the standard that the majority has designed.

In my view, it is unnecessary and inappropriate to engage, as do my colleagues, in a series of judgmental evaluations as to which of an infinite variety of intimate acts requires a lesser or greater degree of privacy in order to be afforded constitutional protection. Because any intimate act between consenting persons is to be afforded constitutional protection if it occurs in a private place, the nature of the intimate act is immaterial. Rather, the appropriate standard for determining whether a given intimate act should be afforded constitutional protection is whether the persons engaging in that act, irrespective of its nature, have a reasonable expectation of privacy in the location in which the act is being performed.

Upon my constitutionally-mandated, independent appraisal of the record, I find as a fact that the sexual activity of both Neville and Kelly occurred in a private place. I agree with the majority that Neville and Kelly "chose for the intimate sexual activity a place which was out of doors, which was in a well populated community, and which was equally as accessible to any member of the public as it was to [Neville or Kelly]." There are other factors, however, that, in my view, must be taken into account in determining whether the place in which the sexual activity occurred was public or private.

In Neville's case, the record shows that the site selected was a secluded spot located some distance away from the

activity associated with an existing commercial center. The site itself consisted of a very small clearing in a heavily wooded area overgrown with waist-high sticker bushes. Although the clearing was only 10 to 15 feet away from the railroad tracks, it was at an elevation approximately four feet higher than the tracks so that the view from the tracks into the clearing was impeded. The record further shows that while Neville and the female involved were in the clearing, two men from the rescue mission, walking down the tracks from the commercial center, came "within 15 feet" of the clearing. Yet there is nothing in the record to show that these people observed any of the sexual activity occurring in the clearing. Finally, the record shows that only one person, the police officer who made the arrest, observed the sexual activity. He testified that before Neville and the female involved entered the clearing, he had anticipated the place to which they might be going and had hidden himself in some nearby underbrush in order to witness the ensuing sexual activity.

All of these facts indicate that it was highly unlikely that any passerby or casual observer could or would observe any sexual activity occurring within the clearing and that the site was, therefore, a private and not a public place.[4] Thus, Neville's choice of the site for the purpose of engaging undiscovered and undisturbed in intimate sexual activity was supported by a reasonable expectation of privacy.

---

4. In my view, the trial court implicitly found that the site was a private, not a public place. In Messina v. State, 212 Md. 602, 605, 130 A.2d 578, 579-80 (1957), this Court stated:

> " 'Indecent exposure in a public place in such a manner that the act is seen or is likely to be seen by casual observers is an offense at common law \*\*\*. Ordinarily, \*\*\* *the place where the exposure is made must be public.* What constitutes a public place within the meaning of this offense depends on the circumstances of the case. *The place* where the offense is committed *is a public one if the exposure* be such that it *is likely to be seen by a number of casual observers* \*\*\*.' " Quoting 67 C.J.S., *Obscenity* § 5 (1955) (emphasis added).

Here, the trial court's acquittal, by definition, had to be premised upon a finding that the site was not likely to be seen by casual observers, and, therefore, was private. Indeed, the trial court further found that the site was private despite the fact that there was an eyewitness because that

In Kelly's case, the record shows that the site selected was a "secluded spot, far off the beaten path" located between one-fourth and one-half mile from the nearest paved road, one-fourth mile from the Rod and Gun Club, and one-half block through a wooded area to the nearest home. The site itself consisted of the area surrounding a rusted-out shed on an abandoned missile site that was not visible from either the road or the home. The record further shows that while Kelly, Holden, and the female involved were at the shed, children from the nearby home were searching the grounds of the Rod and Gun Club for a mislaid wallet. Yet there is nothing in the record to show that these children observed any sexual activity occurring at the shed. Finally, the record shows that there were no eyewitnesses to the sexual activity. Indeed, in closing argument, the State conceded that the site was a private, not a public place, when it said:

"And as is the nature of the crime, where the crime takes place, it takes place in an isolated area, where there is little likelihood of being detected or seen."

All of these facts indicate that it was highly unlikely that any passerby or casual observer could or would observe any sexual activity occurring within the site and that the site was, therefore, a private and not a public place. Thus, Kelly's choice of the site for the purpose of engaging undiscovered and undisturbed in intimate sexual activity was supported by a reasonable expectation of privacy.

Here there was evidence to show that Neville and Kelly engaged in private, consensual, sexual activity. The State

---

eyewitness was "required to virtually stalk the Defendant" and "was not a 'casual observer.' " I agree with the trial court's finding that the site was a private place.

The majority concludes that Neville's acquittal of indecent exposure does not establish that the intimate act occurred in a place sufficiently private to be afforded constitutitional protection. In essence, the majority concludes that a place sufficiently private for performance of an act of indecent exposure is not sufficiently private for performance of an act of fellatio. The record is devoid of any factual, empirical, statistical, or psychological data to support that conclusion. The circumstances here graphically illustrate the unnecessary difficulties inherent in the application of the majority's standard that requires a judgmental evaluation of the relative intimacy of given sexual acts, frequently in the absence of any supporting data.

failed to show that factors such as protection of individuals, especially children, control of venereal disease, maintenance of a citizenry that can function well in society, preservation of heterosexual marriage, and guarding the public morality constitute compelling State interests that justify State regulation of such activity. Indeed, the conclusion that Maryland does not have a compelling interest in regulating private, consensual, sexual activity is supported by the fact that in 1976 in § 464A the Legislature established that a person is not guilty of a sexual offense in the second degree (perverted practice) if he engages in such activity with the consent of a person 14 years and older.[5]

Under these circumstances, Art. 27, § 554 which regulates private, consensual, sexual activity unjustifiably interfered with the fundamental personal rights of Neville and Kelly. Therefore, I would hold it unconstitutional as applied to the private, consensual, sexual activity here. Accordingly, I would reverse.

---

5. Art. 27, § 464A provides in pertinent part:
   "(a) . . . A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person:
   (1) . . . without the consent of the other person. . . .

   . . .

   (3) Under 14 years of age and the person performing the sexual act is four or more years older than the victim."
   Art. 27, § 461 (e) provides in pertinent part:
   "'Sexual act' means cunnilingus, fellatio, analingus, or anal intercourse, but does not include vaginal intercourse."

Because cunnilingus, fellatio, analingus, or anal intercourse all involve perverted practices, a person is guilty of a sexual offense in the second degree only if the person engages in a nonconsensual, perverted practice.